THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ERNEST ATTAWAY *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 61276

Opinion filed August 24, 1976.

James Streicker and Patrick J. Hughes, Jr., both of State Appellate Defender's Office, of Chicago, for appellant Ernest Attaway.

Nathaniel R. Howse, of Chicago, for appellant Jesse Campbell.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and David A. Novoselsky, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Ernest Attaway and Jesse Campbell (hereinafter defendants), after a joint jury trial, were found guilty of armed robbery (Ill. Rev. Stat. 1971, ch. 38, par. 18—2) and sentenced to four to eight years. The following issues are presented on appeal:

(1) did the trial court err in denying defendants' pretrial motion to suppress and motion for a mistrial, each of which urged the initial identification of defendants was improper because:

(a) it was the fruit of an illegal arrest; and

(b) it was unduly suggestive and constitutionally defective;

(2) did the trial court err in denying defendants' motion for a mistrial

which alleged systematic exclusion of blacks from the jury, thereby denying defendants a fair trial[1];

(3) did the trial court improperly limit defense counsel's examination of witnesses;

(4) did the trial court err in refusing to give a jury instruction regarding defendants' defense of mistaken identification[1];

(5) did the trial court err in denying defendants' motion for a mistrial on the basis of the prosecutor's prejudicial cross-examination and closing argument[1]; and

(6) were defendants proved guilty beyond a reasonable doubt.

Defendants were arrested on April 13, 1972, for the armed robbery of a Kentucky Fried Chicken establishment at 5200 West North Avenue in Chicago, Illinois. Prior to trial the court heard evidence on defendants' motion to suppress certain out-of-court identifications which allegedly were the result of (i) an illegal arrest and (ii) a suggestive and constitutionally defective confrontation. The following is a summary of the pertinent testimony presented by the defendants on the said motion to suppress.

### Motion to Suppress

John Serafini, a sergeant of the Chicago Police Department, testified that on April 13, 1972, at about 9:15 p.m., while on duty, in uniform, and driving a police car, he heard a radio communication that a robbery was in progress at the Kentucky Fried Chicken establishment at Laramie (5200 west) and North Avenue (1600 north). The suspects were described as two male Negroes in their early twenties wearing a green jacket and a green shirt. At the time he received the call, Serafini was about eight blocks south of the scene of the robbery. As he proceeded north to the scene, he flashed his lights on eight other vehicles, all of which were occupied by Caucasians, and he then noticed a white Pontiac station wagon occupied by two male Negroes in their twenties traveling at approximately 35-40 miles per hour—5-10 miles over the speed limit—in a southerly direction at 1300 North Laramie. Serafini was traveling at about 40 miles an hour with his mars light flashing, and, when he saw defendants, he flashed his spotlight in their car; instead of pulling over, they continued in a southerly direction on Laramie. Serafini made a U-turn, radioed for assistance, and pursued the defendants. The Pontiac pulled over within three blocks at about 1000 North Laramie. When the Pontiac stopped, two black males exited the car. Serafini then exited his squad car with his weapon drawn and told the men to put their hands on the roof of the Pontiac, and then waited for an assist car to arrive. An assist car arrived within a few seconds and Officer Giacalone informed

---

[1] This issue was not raised by defendant Campbell.

Serafini a recent radio communication described the robbery suspects as having red clothing on. In response to a question by Serafini as to where they were coming from, the defendants said they had been visiting a girl friend and got lost trying to find their way home. Since one of the defendants was wearing a sport jacket with a red collar, the officers decided to take them back, not handcuffed, to the scene of the alleged incident for possible identification. Upon pulling into the parking lot, as the defendants stepped out of the car, one of the victims standing by the window pointed to them and shouted, "That's them, that's them." Serafini testified that he had no warrant for the arrest of either defendant, that he had not seen them commit any offense except speeding, and that no physical evidence was found in their car or on their person which would connect them to the robbery. Serafini further testified that the incident occurred in a white area and, from the time he first received the call, he did not see any other Negroes in the area.

Officer Andrew Giacalone, the assisting officer at the scene of defendants' stop, testified he heard a radio communication which described the alleged offenders as two male Negroes, 18 to 22 years of age, and between 5 ft. 10 in. to 6 ft. tall; that the men were wearing red jackets; that he arrived at the place where Serafini had stopped the two defendants about two minutes after hearing the communication; that at the time of his arrival at the location of the stop, both men were wearing red jackets; and that he suggested to Serafini that the men be returned to the scene.

Officer Ben Crimmins testified regarding his investigation at the Kentucky Fried Chicken establishment shortly after the crime was committed. He interviewed the victims and took their descriptions of the alleged offenders and issued a communication over the police radio describing these offenders as two dark-complected Negro males around 5'9" and 5'10" with dark hair. One of the offenders had a beard and was approximately 19 to 20 years of age. One offender was wearing a red jacket and striped pants; and the other was wearing a beige jacket and dark pants. He also described the confrontation between defendants and the victims of the robbery at the Kentucky Fried Chicken establishment on the evening of the crime when the defendants were brought there by the police.

After the three police officers testified, the trial court held that the defendants were under arrest prior to being brought back to the chicken store; that, based upon the description given and the fact that the suspects were apprehended in the area of the robbery, there was probable cause for their arrest. The motion to suppress the identifications as the fruits of an illegal arrest was denied.

The defendants, in connection with their motion to suppress the

identification, called the three employees in the store at the time of the incident. Carl Witte, the manager of the store, testified concerning the event and stated that, while he was working in the back, a male Negro, dark-complected with a green shirt on, came into the store and ordered and paid for a dinner; that shortly thereafter another employee, Joe Fiore, who had been mopping the lobby, came to the back followed by a male Negro about six feet tall, wearing a goatee and a long tan overcoat, and holding a small snub-nosed pistol; that at the direction of the latter, he took money out of the safe, and pursuant to the direction of one of the men, the money was put in a Kentucky Fried Chicken bag; that the first man in the store came into the back with a knife from the store; that the three employees were marched into the walk-in cooler and told by one of the men, "Don't come out, because there is a fellow out there with a shotgun"; that after about 15-20 minutes the three exited the cooler and discovered that the phone had been ripped off, whereupon he went next door and called the police and gave the police a description; and that shortly thereafter the police arrived. Witte further testified that the first man was in the store about 10 minutes before the second entered; that, after the second man entered, the two were in the store 15 to 20 minutes; and that at all times the lights were on in the store.

Lorenzo Monno, also an employee, testified that at a little after 9 p.m. he was in the back mopping the floor when someone grabbed his hand; that it was a male Negro, around five-nine, five-ten, in his late teens or early twenties, medium build with a greenish shirt on; that, after checking the cooler, the male Negro grabbed a knife off the shelf; and that he (the witness) was then sent to the front of the store. Monno identified the second man as black, in the early twenties, about six feet tall, wearing a green-like army-type coat, and had a little red around his collar, and was holding a revolver; that Witte put money in a paper bag, after which all employees had to go into the walk-in cooler for about five minutes. Monno testified that, after exiting the cooler and upon the arrival of Officer Crimmins, he described the men; that one had green with red showing around the collar; that the police officer told him, "We have two suspects for you to look at"; that other officers arrived in a couple of minutes; that he looked out the window and observed two white police officers exiting a vehicle with the two black men; and that the police asked him if he recognized the men and he nodded his head. Monno further testified that he observed the man who grabbed his hand face-to-face; and that the lights were on in the store.

The third employee, Joseph Fiore, testified on the motion at a later date and after the trial court had denied defendants' motion. Fiore testified that, while he was washing the floor in the customer area, a guy walked in and ordered a meal, at which time there was a knock on the back door

which the boss ordered not to be opened; that he looked up and saw a gun in his face, and he was ordered into the back room by the defendant Attaway; that defendant Campbell grabbed another employee and brought that employee and the witness to the front; that the money was taken from the cash register and placed in a bag; that one of the men pulled the phone off and directed him to help, after which they were put in the cooler for about three minutes; then the boss went next door to call the police who arrived in about 13 minutes; and that he described the men to the police as follows: the one with the gun was about six feet tall, wore a long beige overcoat and you could see red around the collar; the other who had ordered the meal was about 19 years old, about five feet eleven, and had a green checked sweater. Fiore also said he told the police one of the men had a beard; that, about ten minutes after he had talked to the police, the two men were brought back by the police, at which time he was standing by the window and a squad car drove up and two white cops in uniform and the two defendants got out; that they were not handcuffed; and that the men were brought into the store and he identified the men.

The trial court denied defendants' motion to suppress the identifications, noting that the Illinois courts have consistently upheld the investigatory procedure of returning a suspect to the scene of a crime for immediate identification.

## Trial

During the jury selection defense counsel moved for a mistrial on the basis the prosecutor had systematically used his peremptory challenges to exclude blacks from the jury, thereby denying defendants their right to a fair trial. The motion for a mistrial was denied and the matter proceeded to trial.

The State introduced testimony of the robbery victims and the arresting officer—Officer Serafini. In summary, the events of that evening, according to the witnesses, were as follows. Carl Witte, manager of the Kentucky Fried Chicken establishment, and his two employees, Larry Monno and Joseph Fiore, were preparing to close the store about 9 p.m. on April 13, 1972. Witte was at the service window, Monno was cleaning in back, and Fiore was mopping the front lobby. There were two customers in the shop: a woman who placed her order, took it, and left; and a man who ordered a dinner which was given to him by Witte. After waiting on the man, Witte proceeded to clean up. There was a knock on the closed back door and Monno, without opening the door, told the party to come around front. A man then appeared in front and brought Fiore into the back at gunpoint. The man who bought the chicken dinner went to the back of the store, picked up a knife, and brought Monno and

Fiore out front. All three employees were gathered near the service counter and Witte was ordered to put the money from the cash register and the safe into the paper bag. The money was placed in a Kentucky Fried Chicken bag, and the robbers then walked the victims to the back of the store and put them in the cooler. Fiore and Witte testified the robbers told them not to come out of the cooler right away because there were persons in the parking lot with shotguns. After about two or three minutes, the victims came out of the cooler and Witte went next door to call the police.

The police arrived within a few minutes and the victims related what had happened. They described their attackers as two male Negroes: one about six feet, 180 pounds, wearing a long beige or off-white coat buttoned to the top; and the other as about five feet nine or ten inches, 150 pounds, wearing a green shirt. Fiore testified he saw something red around the collar of the robber in the long beige coat. Each of the victims made an in-court identification of each of the defendants, as well as giving a description of defendants as they appeared on the evening of the crime. Attaway was identified as the robber with the gun, and Campbell as the robber who picked up the knife.

On cross-examination of Witte, defense counsel attempted to lay the grounds for impeachment by inquiring about a conversation had between the witness and defense counsel regarding identification. The trial court sustained the State's objection to this line of questioning and informed defense counsel that, in order to continue this line of questioning, he would have to take the stand and impeach the witness, and this would mean withdrawing as counsel in this case. Counsel refused to withdraw, and instead made an offer of proof that Witte had advised defense counsel of his lack of ability to distinguish one black individual from another.

It was stipulated that at the time of trial (February 1974), defendant Campbell was 21 years of age and defendant Attaway was 20 years old. The defense presented four witnesses who testified to defendants' good characters and reputations. Each of the defendants also testified on his own behalf. Each denied having any part in the alleged robbery or knowing anything about it. Defendants testified that, driving in a borrowed car, they had been looking for the Schwinn Bicycle factory, around Grand and Kostner,[2] seeking part-time employment, but that they could not find the place and were on their way home when they were stopped by the police.

During closing arguments to the jury, defense counsel objected to several alleged improper statements made by the prosecutor. The trial

---

[2] The court will take judicial notice (*Nordine v. Illinois Power Co.* (1965), 32 Ill. 2d 421, 428, 206 N.E.2d 709) of the public record that Grand Avenue is approximately 1600 north and Kostner, 4600 west.

court sustained these objections but refused to grant a motion for a mistrial on the basis of those statements.

Defense requested an instruction on identification since mistaken identification was defendants' sole defense. Such an instruction was not given; the court confined itself to the general instruction regarding credibility of witnesses (IPI—Criminal No. 1.02) and regarding the burden of proof (IPI—Criminal No. 2.03) which the State must bear.

## I.

We first consider whether the trial court erred in denying defendants' pretrial motion to suppress and motion for a mistrial, each of which urged the initial identification of defendants was improper because (a) it was the fruit of an illegal arrest, and (b) it was unduly suggestive and constitutionally defective.

## A.

First we consider the legality of the arrest. While it is debatable whether the initial stop of defendants was an investigatory stop or an arrest, the trial court ruled it was an arrest, not a temporary detention. After stating the only question was whether the officers could make this arrest two blocks away from the scene of the offense, the trial court held that, based on the descriptions and the apprehension in the area, there was probable cause for the arrest.

■■ The distinction between an *investigatory stop* and *arrest* has confounded, and continues to confound, the courts, lawyers, police, and commentators. As we said in *People v. Moorhead* (1st Dist. 1974), 17 Ill. App. 3d 521, 525, 308 N.E.2d 381:

> "An 'arrest' is 'the taking of a person into custody' (Ill. Rev. Stat. 1969, ch. 38, par. 102—5) and is accomplished 'by an actual restraint of the person or by his submission to custody' (Ill. Rev. Stat. 1969, ch. 38, par. 107—5(a))."

We also pointed out that section 107—14[3] of our Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 107—14) provides for temporary questioning without arrest. In *Moorhead*, after reviewing the many cases involving the right of a police officer to justify a "stop," we concluded the facts did not justify the officers in stopping Moorhead pursuant to section 107—14. Here, the question we must first resolve is whether Officer Serafini had reasonable grounds to stop the defendants.

---

[3] Section 107—14 reads:

"A peace officer, after having identified himself as a peace officer, may stop any person in a public place *for a reasonable period of time when the officer reasonably infers from the circumstances that the person* is committing, is about to commit or *has committed an offense as defined in Section 102—15 of this Code,* and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." (Emphasis supplied.)

We first consider the stop. Officer Serafini, while on duty, received a radio broadcast in his patrol car that an armed robbery was in progress eight blocks away from him. A description of the robbers was given—two male Negroes in their early twenties wearing a green jacket and a green shirt. Serafini proceeded toward the scene of the robbery at about 40 miles per hour, flashing his mars light and shining his spotlight in the cars as he passed. About three blocks from the scene of the robbery, he passed a white Pontiac with two male Negroes traveling away from the scene of the robbery at what he estimated was about 35-40 miles per hour—5-10 miles over the speed limit. Serafini flashed his spotlight on the Pontiac, but the vehicle did not pull over and the officer decided to stop the vehicle. He made a U-turn and radioed for assistance. The Pontiac pulled over within three blocks and two black men wearing red jackets exited the car. Serafini exited his squad car with his weapon drawn and told the men to put their hands on top of their car. Within a few moments Officer Giacalone arrived in the assist car. Giacalone informed Serafini that a recent radio communication had described the robbery suspects as wearing red jackets. Based on this new information, the officers took the defendants in a police car back to the Kentucky Fried Chicken store for viewing by the victims.

Upon seeing two male Negroes, appearing to be in their early twenties and traveling at a rate of speed in excess of the speed limit, within three blocks of the scene of an armed robbery which had just been reported by radio to the investigating officer as then being in progress by two young male Negroes, it is our opinion that at that time the officer had sufficient grounds to stop defendants and question them concerning the robbery. We think the officer could reasonably infer from the circumstances cited above that the defendants had committed, or were suspects in, the armed robbery. Thus the stop was justified pursuant to section 107—14. (See *People v. Robinson* (1976), 62 Ill. 2d 273, 277, 342 N.E.2d 356; *People v. Sanford* (2nd Dist. 1976), 34 Ill. App. 3d 990, 997, 341 N.E.2d 453; *People v. Hobson* (1st Dist. 1971), 1 Ill. App. 3d 512, 515, 275 N.E.2d 272; but *cf. People v. Lee* (N.Y. Sup. Ct. 1975), 375 N.Y.S.2d 812, 815, 84 Misc. 2d 192; *People v. Harris* (1975), 15 Cal. 3d 384, 540 P.2d 632, 124 Cal. Rptr. 536, 539, *cert. denied*, 44 U.S.L.W. 3592.) Moreover, defendants were traveling at a speed in excess of the speed limit. That in itself would justify the officer stopping defendants.

We next consider the investigation. Serafini had grounds to believe this could be more than a mere traffic violation. He had reasonable grounds to suspect the men in the car could have been involved in an armed robbery; and therefore, he was justified in exiting his squad car with his weapon drawn and waiting for an assist car to arrive before continuing the investigation. The assist car arrived within a few moments, and assisting

officer Giacalone provided sufficient articulable facts to constitute probable cause for believing defendants had committed the armed robbery. The assisting officer informed Serafini a new radio communication described the offenders as wearing red jackets, and defendants were wearing red jackets. The defendants stated they had been visiting a girl friend and got lost trying to find their way home.

The situation at bar is similar to that of *People v. Sanford*, in which the police stopped a vehicle traveling at a fast rate of speed some 17-18 blocks from a place where an armed robbery had occurred a few minutes earlier. After stopping defendants, the police received additional information over their radio naming one of the occupants of the car as a suspect in a recent crime involving a group of offenders. Thereupon, the court held there was sufficient probable cause to arrest the others in the car. In *People v. Almeido* (1st Dist. 1976), 39 Ill. App. 3d 197, 350 N.E.2d 191, a suspicious car was stopped for a traffic violation and during the time the officer was issuing the citation he received a radio communication implicating defendants in a crime. This information provided probable cause for their arrest.

The Illinois Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 107—2(c)) provides that a person may be arrested without a warrant when a police officer has reasonable grounds to believe that the person arrested is committing or has committed an offense. The facts must be specific and articulable, supporting a reasonable belief the suspect has been engaged in criminal activity. (See *People v. Sanford*, 34 Ill. App. 3d at 993.) Whether a police officer had probable cause to arrest depends on the totality of the facts and circumstances of each case.[4] (See *In re Woods* (1st Dist. 1974), 20 Ill. App. 3d 641, 647, 314 N.E.2d 606.) Or, was the stop "such an 'inarticulate hunch' " as vitiated the stop in *Moorhead* (17 Ill. App. 3d 528). In determining whether the warrantless arrest in the case at bar was lawful, we must consider the circumstances of the arrest.

■■ Mere suspicion is not sufficient grounds to arrest a person, but where there are hard and articulable facts on which the arresting officer can base his action, the arrest is legal. Defendants' location, traveling at a speed in excess of the speed limit and away from an area where a crime had been committed, their physical appearance which satisfied a general description given of the robbery suspects, and their red jackets which matched a specific description of the robbery suspects, constituted hard and articulable facts justifying the police to further their investigation by returning the defendants to the scene of the crime.

Defendants argue the general description given of the robbery suspects, and the fact defendants were in the area in which a crime was

---

[4] See *United States v. Watson* (1976), 423 U.S. 411, 415, 427, 46 L. Ed. 2d 598, 96 S. Ct. 820, for a discussion re probable cause.

committed traveling at about five miles over the speed limit, does not constitute probable cause to arrest defendants for armed robbery. In support of this argument, defendant cites *United States v. Shavers* (8th Cir. 1975), 524 F.2d 1094, and *In re Woods*.

However, the arrest in the case at bar, unlike *Shavers*, was not based on mere presence in the area where a crime had been committed and a general description had been given. In this case the arresting officer received additional information that the alleged robbers were dressed in a manner similar to defendants—wearing red jackets. Furthermore, in *Shavers* the testimony of the arresting officer had been impeached by a witness to the arrest. The contrary is true in this case, since the arresting officer's testimony was corroborated by the assisting officer. While defendants contend the lack of a basis for the red jacket description impeaches the officers, no evidence was elicited at the hearing which would cast doubt on the truth of the red jacket description. The officer who gave that information over the radio testified at the hearing on the motion, but defense counsel did not question him as to the source of the red jacket description. Therefore, at the time the court ruled on the motion, there was no reason for the court to doubt the validity of that description.

*Woods* also differs from the case at bar. The defendant in *Woods* had a proved excuse for being in the area, because he lived there. Also, defendant was a juvenile being accused of robbery by another juvenile whose identification of defendant was less than certain.

■■ Defendants further contend it was proved at trial that the second radio communication regarding red jackets had no basis in reality, and that the motion for mistrial made after the State rested [5] should have been granted. However, defendants alleged no new evidence or reason for having been unaware of existing evidence at the time of the hearing on the motion to suppress. All the victims of the robbery were present at the motion to suppress; defense counsel did not request the trial court to hear their testimony before ruling, and never argued at that hearing that the red jacket description had no basis in reality. Furthermore, in presenting its case, the State introduced testimony to the effect one of the witnesses saw red around the collar of the robber wearing the beige coat. This may have been the basis for the red jacket description, but we cannot find any evidence regarding this point presented by defendants; and therefore, we have no basis on which to rule the officers were not believable. The credibility of the witnesses and defendants' guilt were questions for the jury. Based on the record, the trial court properly refused to reconsider

---

[5] The motion for mistrial was essentially a motion to reconsider the denial of defendants' pretrial motion to suppress the on-the-scene identification as being the fruits of an illegal arrest.

the issue of probable cause for defendants' arrest. The law is clear such a motion should not be reconsidered merely because the defense has discovered a new argument. New evidence must be alleged or a reason for not presenting relevant evidence at the prior hearing must be asserted before the court may reconsider a motion which has been previously determined. See *People v. Holland* (1974), 56 Ill. 2d 318, 321, 307 N.E.2d 380.

Even if the issue of probable cause were to be reconsidered, we fail to understand defendants' argument that *Whiteley v. Warden* (1971), 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031, is controlling. *Whiteley* involved an arrest based solely on a radio communication which indicated there was a warrant for defendant's arrest. The warrant was proved invalid, and therefore there was no basis for the defendant's arrest. Admittedly there was no warrant in the case at bar for defendants' arrest. As we have explained, this arrest was based on probable cause.

In our opinion the trial court properly denied the motion to suppress and the motion for mistrial on the basis the arrest was illegal. The arrest of defendants in the case at bar was supported by hard and articulable facts constituting probable cause to take defendants into custody for investigative purposes. See *Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868.

The arrest of the defendants, lawful or unlawful, did not convict these defendants. An arrest is not evidence. It is an event which brings about the trial on the critical issue of guilt or innocence. The arrest did not smash and extinguish the presumption of innocence of each defendant. In our opinion, even if the arrest was illegal, the in-court identification, as discussed below, was clear and convincing and had a basis which was independent of the subsequent on-the-scene identifications which followed the arrest, namely, observations made during the course of the armed robbery itself.

B.

Secondly defendants contend the identification should be suppressed because it was the result of a suggestive and constitutionally defective confrontation, in that they were the only black males in the area at the time of the identification; they were brought to the scene in a squad car, in police custody; the victims who identified defendants knew the police were bringing suspects back to the chicken store for an identification; and defendants did not have the benefit of counsel at the time of the confrontation.

Our supreme court held in *People v. Newell* (1971), 48 Ill. 2d 382, 385, 268 N.E.2d 17, that a defendant is not always entitled to be represented by counsel at a pretrial confrontation. In *Newell*, the victim of a robbery

was brought to the scene where a suspect had been apprehended, and the victim identified that suspect as one of the robbers. The court noted it had previously held that such an "identification in the absence of counsel did not deprive the defendant of his constitutional right to counsel and pointed out that police officers had a duty to determine at once whether or not the victim of the crime could identify a person in custody as the man who had committed the crime." In *Newell* the court stated:

"We are of the opinion that the identification here, coming soon after the crime and near the scene of the crime, did not violate any of the rights of the defendant." 48 Ill. 2d 382, 385.

In *People v. Dunn* (1st Dist. 1975), 31 Ill. App. 3d 854, 857, 334 N.E.2d 866, defendant was returned to the scene of a robbery for further identification. In that case this court noted: .

"The practice of showing suspects singly to persons for the purpose of identification and not as part of a lineup has been widely condemned, but it may be justified when prompt identification is necessary and where it is apparent that the witness had an excellent opportunity to observe the defendant during the commission of the crime. [Citations.]"

In the case at bar the victims had an opportunity to see the robbers under good lighting conditions for about ten minutes. Also in this case, as in *Dunn*, it was necessary for the police to determine quickly whether defendants were the robbers or whether the defendants should be promptly released and the police should continue their search.

■■ Defendants argue the confrontation was unduly suggestive because they were the only black males in the vicinity during the confrontation, and they were brought back to the store in a police car and the victims knew the police were bringing suspects back for identification. However, defendants presented no evidence that the police pointed out, or in any way suggested, the defendants were the suspects; rather, as soon as defendants emerged from the squad, one of the victims saw them through the window and started screaming, "That's them." The mere knowledge that suspects might be brought back for identification and the transportation of these suspects in a squad car does not make a positive and volunteered identification unduly suggestive. Nor is the factor that defendants were the only blacks in the area persuasive, since that could suggest that all black men look alike.

The immediate confrontation between defendants and the victims of the robbery was justified under the circumstances of the case. There is absolutely nothing in the record which we can find which points to any improper suggestion. The trial court properly denied defendants' motion to suppress the identification resulting from this confrontation.

## II.

■■ We next consider defendant Attaway's contention that the defendants were prejudiced by the prosecutor's exercise of the State's peremptory challenges to exclude blacks from the jury panel. The prosecutor exercised eight of his peremptory challenges to excuse black persons from the jury panel which resulted in an all-white jury. During the course of the voir dire, defendant Attaway asked the trial court to hold a hearing on whether the State was purposefully excluding blacks from the jury. The hearing was refused. Later a motion for mistrial was denied.

Our supreme court commented on the use of peremptory challenges to exclude persons on the basis of race in *People v. Harris* (1959), 17 Ill. 2d 446, 451, 161 N.E.2d 809:

"The fact that the State's exercise of peremptory challenges resulted in excluding them [blacks] from the petit jury did not deprive defendant of any constitutional right. [Citation.] The right of peremptory challenge is a substantial one which should not be abridged or denied. It may, by its very nature, be exercised or not exercised, according to the judgment, will or caprice of the party entitled thereto, and he is not required to assign any reason therefor. [Citation.]"

From our review of the record we do not believe the defendant established a *prima facie* case of purposeful discrimination in the jury selection procedure. See *People v. Powell* (1973), 53 Ill. 2d 465, 477-78, 292 N.E.2d 409.

This court decided this same issue in *People v. Thornhill* (1st Dist. 1975), 31 Ill. App. 3d 779, 783, 333 N.E.2d 8, and hold that case to be dispositive of this issue.

Since a peremptory challenge may be exercised without explanation or without being subject to control by the court, the trial court did not err in refusing defendant's motion for a mistrial based on the prosecutor's use of the State's peremptory challenges.

## III.

■■ Defendants' next contention is that the improper limitation of defense counsel's examination of witnesses was so prejudicial as to violate their sixth amendment right of confrontation and the fourteenth amendment right to due process of law. This argument can be divided into two parts.

## A.

First, defendants argue their examination of witnesses at the motion to suppress and at trial was improperly limited by the trial court. At the motion to suppress defense counsel requested the court to allow a wider

latitude than is usually allowed for the direct examination of the police officers and the victims of the robbery. In fact, at one point in the motion hearing, the trial court denied counsel for defendant Attaway's motion to examine a police officer pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 60). Defendants contend that in the hearing on the motion to suppress it was necessary for the defendants to call the police officers involved in the incident, and, therefore they should be allowed to lead or cross-examine the witnesses in the direct examination. While the trial court should allow, under such circumstances, some freedom, we do not think such witnesses can be called and examined under section 60.

The trial court limited defense counsel's examination of Officer Crimmins at the motion to suppress, sustaining the State's objections to defense counsel's questions inquiring into the descriptions of the robbers given to Crimmins by the victims. While we agree the court improperly sustained these objections, we do not find the error was prejudicial, as the same information was obtained when the victims themselves testified as to the descriptions they gave the officers.

■■ It is further urged that at trial the court limited defense counsel's cross-examination of the victims as to the circumstances surrounding the initial identification of the defendants on the night of the occurrence. Defense counsel argued this line of questioning was important to challenge the witnesses' ability to observe and identify defendants. We agree this line of questioning was proper and the court improperly sustained some of the State's objections; however, this restriction was not prejudicial since the total record clearly established that the defense did examine the witnesses concerning their ability to observe and identify defendants. In fact, the defense was allowed to remove defendants from the courtroom and question the victims regarding defendants' present appearance.

We have reviewed the record and conclude there was no prejudicial error committed in this regard.

### B.

■■ Defendants' primary contention regarding the limitation of cross-examination was the trial court's refusal to allow the defense to question Witte, the manager of the Kentucky Fried Chicken store, regarding a conversation between Witte and defense counsel. Defense counsel was attempting to use that conversation to impeach the witness. However, the trial court ruled that, unless defense counsel could take the stand to impeach the witness, this line of questioning was improper. And the trial court further ruled that defense counsel would not be allowed to take the stand and testify on defendants' behalf unless he withdrew from the case.

Defense counsel refused to withdraw, and instead made an offer of proof—which was denied—that, if he were allowed to take the stand, he would testify Witte had indicated to defense counsel in a prior conversation that he had difficulty distinguishing characteristics of black persons, and that he assumed the defendants were the robbers because the police had apprehended them so quickly.

The Illinois Code of Professional Responsibility, Canon 5, DR 5-102, provides:

"(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5—101 (B)(1) through (4)."

The only exception which might be beneficial to defense counsel would be (4) which provides an exception to the above rule if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case. However, defense counsel did not provide evidence of any distinctive value which he had to offer that another defense attorney could not offer after becoming familiar with the case. While the trial attorney is not incompetent to testify on behalf of his client, there is a reluctance to permit an attorney to appear in the same cause as both an advocate and a witness. (*People v. Gendron* (1968), 41 Ill. 2d 351, 358, 243 N.E.2d 208.) Normally the courts will not permit a lawyer to be called to testify in favor of the party whom he represents. R. Hunter, Trial Handbook for Illinois Lawyers §3.9 (4th ed. 1972).

None of the cases cited by defendants hold that a trial court must allow an attorney to testify on his client's behalf while he continues to represent that client. *People v. Kuczynski* (1961), 23 Ill. 2d 320, 178 N.E.2d 294, strongly urged to support the defendants' contention, involved a case in which the defendant's counsel was denied leave to withdraw as the attorney in order to offer contradictory testimony to that of a witness who had surprised defendant by identifying him as the robber. The supreme court said the trial court abused its discretion in denying counsel the right to testify and in refusing to allow a continuance to secure witnesses to challenge the surprise testimony. Here counsel was acting as an investigator and should have been aware that in so doing he created the possibility that he might have to testify. Having placed himself in this potential problem, he certainly cannot claim the "surprise" involved in *Kuczynski.* We do not find any error in the trial court's ruling.

## IV.

■■ Fourthly, defendant Attaway contends that the court erred in refusing to give an instruction to the jury specifically dealing with identification of defendants, since defendants' sole defense was mistaken identification. The trial court refused to give the instruction tendered by defendants and limited itself to the Illinois Pattern Jury Instructions on witness credibility and on the State's burden of proof, IPI—Criminal No. 1.02; IPI—Criminal No. 2.03.

These were the same instructions which this court held to be sufficient in instructing the jury as to the defense of mistaken identification in *People v. Neeley* (1st Dist. 1974), 18 Ill. App. 3d 287, 292, 309 N.E.2d 725. Furthermore, our supreme court noted in *People v. Fox* (1971), 48 Ill. 2d 239, 249, 269 N.E.2d 720, where a similar contention was made:

> "The defendant complains that since his theory of defense was erroneous identification he had a right to have his instruction on identification given. IPI-Criminal section 3.15 recommends that no instruction be given on this subject stating that the subject is adequately covered by instruction No. 1.02 on credibility of witnesses. Instruction No. 1.02 was given as State's instruction No. 2. The court also gave IPI-Criminal instruction No. 2.03 as State's instruction No. 4. This instruction covers the presumption of innocence and the burden of proof on the State to prove the defendant guilty beyond a reasonable doubt. We think these two instructions adequately cover the subject matter of defendant's instruction No. 3 in a clearer and more concise and accurate manner than defendant's instruction."

The instruction tendered by defendants was patterned after a "Model Special Instruction on Identification" adopted in *United States v. Telfaire* (D.C. Cir. 1972), 469 F.2d 552, 558. Defendant argues the acceptance of this instruction in the Federal courts distinguishes the case from *Fox* and *Neeley* in which the court determined the instructions tendered by those defendants were not clear and had never been approved by another court. Supreme Court Rule 451(a) provides that, when the IPI—Criminal does not contain an instruction on a subject, any instruction given should be "simple, brief, impartial, and free from argument." (Ill. Rev. Stat. 1971, ch. 110A, par. 451(a).) The tendered instruction fails to meet that test. We are satisfied that the procedure approved by our supreme court is a fair, realistic method in cases involving trial identification and that the trial court did not abuse its discretion in refusing to give this instruction since the Illinois pattern instructions on credibility and burden of proof are sufficient.

■■ Furthermore we find no merit in defendant's contention that

IPI—Criminal No. 14.02, which instructs the jury on the elements of the crime of armed robbery, fails to require the State to prove beyond a reasonable doubt the identity of the defendants as the robbers. Not only does the instruction clearly require the jury to be satisfied beyond a reasonable doubt that a defendant did the act charged, but instructions are not to be considered in isolation; rather, they must be considered in their entirety. *People v. Mills* (1968), 40 Ill. 2d 4, 15-16, 237 N.E.2d 697.

## V.

■■ Defendant Attaway argues that prejudicial error occurred by certain prosecutor's questions during cross-examination and remarks during closing argument.

Specifically defendant refers to the prosecutor's questions during cross-examination of defendant Attaway inquiring whether friends of the defendant owned a shotgun. The trial court properly sustained the defense objection to this line of questioning, but refused to grant a mistrial on that basis.

During closing argument the prosecutor referred to defendants' use of a lookout during the robbery and referred to defendants as members of a gang. These comments were objected to but overruled. However, after overruling the objection, the trial court cautioned the jury not to accept as fact anything said in arguments not in the record.

The prosecutor made several improper remarks to which the trial court promptly sustained defense objections, but refused to grant a mistrial. Those remarks consisted of such comments as: defendants were required to present an excuse for being in the area at the time of the crime; defendants had a motive for robbery because they could not even afford a car; references to the increasing crime rate as reported in the newspaper; remarks such as that those who yell the loudest have the most to object to, and such as that defense counsel's continued objections to the State's argument were due to defendants' inability to refute what the prosecutor was saying.

Only facts founded on the testimony presented at trial or legitimate inferences deducible therefrom are proper in closing argument. (*People v. Wright* (1974), 56 Ill. 2d 523, 531, 309 N.E.2d 537.) In the case at bar, two of the State's witnesses indicated the defendants had made reference to a person with a shotgun in the parking lot who would shoot the victims if they came out of the cooler. On the basis of this testimony the prosecutor's references to third persons were permissible.

■■ The comments made by the prosecutor regarding defendants' obligation to explain their presence at the area of the crime and his comments on the purpose of defense counsel's objections were improper, as were several other overzealous comments made during argument. We

do not condone such behavior, but we are unable to find that the argument in its entirety was so prejudicial as to require reversal of defendants' convictions. Considering the improper comments in sum, we do not believe they caused the jury verdict to be different than it was. See *People v. Lewis* (1976), 38 Ill. App. 3d 995, 999-1000, 349 N.E.2d 528.

VI.

■■ Lastly, defendants contend they were not proved guilty beyond a reasonable doubt because of the circumstances of the initial identification and the failure to find any physical evidence such as the money, shotgun, or clothes worn during the robbery.

Illinois law is clear that identification by a single eyewitness is sufficient to sustain a verdict. (See *People v. Jenkins* (1st Dist. 1975), 31 Ill. App. 3d 910, 917, 335 N.E.2d 87.) Where there is such a positive eyewitness identification, the jury's verdict will not be disturbed, absent evidence the defendants were not guilty beyond a reasonable doubt.

There were three eyewitnesses in the case at bar who testified they viewed defendants during the entire robbery—five to ten minutes—under good lighting conditions. Their credibility and the weight to be given their testimony is a matter for the trier of fact and will not be disturbed on appeal. Absence of physical evidence connecting defendants to the crime was properly called to the attention of the jury during closing argument for the jury's consideration. We have thoroughly reviewed the record and are satisfied that there is adequate evidence in the record upon which the jury could find the defendants guilty of armed robbery beyond a reasonable doubt. It has been often said that each defendant is entitled to a fair trial, not a perfect trial. (*People v. Long* (1968), 39 Ill. 2d 40, 44, 233 N.E.2d 389.) We are satisfied the defendants did receive a fair trial. We find no grounds in the record on which to reverse the finding of the jury.

The judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

STAMOS, P. J., and HAYES, J., concur.