THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MATTHEW BURNETT *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 77-809, 77-1384 cons.

Opinion filed August 3, 1979.

James J. Doherty, Public Defender, of Chicago (Ronald P. Alwin and Mary T. Woodward, Assistant Public Defenders, of counsel), for appellant Matthew Burnett.

Barry S. Frazin, of Chicago (Stephen M. Vetzner, of counsel), for appellant Louis Grenshaw.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendants were convicted of armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2) and sentenced to terms of four years to four years and a day. On appeal, they contend that they were not proved guilty beyond a reasonable doubt. Additionally, defendant Burnett contends that he was denied a fair trial by co-defendant Grenshaw's testimony regarding the purchase of marijuana, while Grenshaw contends that the trial court erred by giving a misleading jury instruction and by refusing to give a reasonable doubt instruction which Grenshaw offered.

At trial, the following pertinent evidence was adduced.

*For the State*

*Warren Beck*

On November 11, 1974, he was a student at DeVry Institute of Technology. During a coffee break between classes he heard a classmate, Jerrold Marshall, talking about a stereo "component set" he was going to purchase. Beck said that he would be interested in buying a set "if it was a good deal," and Marshall told him that he would get $2,000 worth of equipment for $700. After Marshall made a phone call, he told Beck that he could get him the equipment. They left school together around noon, and went to Beck's house at 1617 West 56th Street. There he wrote a check

for $600 and removed $130 from a "piggy bank." He and Marshall then went to the Standard Heritage Bank where he cashed the check for six $100 bills which he put in his pocket. Afterwards they returned to school. Later, he, Marshall and some other classmates went to Marshall's brother's house at 10 South Lockwood. He was supposed to purchase the equipment there, but the seller did not arrive. He gave Marshall his home phone number and left still in possession of his $730. At approximately 6:45 p.m., Marshall arrived at his house, saying that he had lost his phone number. Marshall said that he would "call the guy and tell him we was on our way," but as he started dialing, he asked for a glass of water. He left to get Marshall the water. When he returned 10-15 seconds later, Marshall said, "okey" and hung up the phone. He and Marshall each counted their money, and Marshall said that they were going to "47th and Hermitage, Margefield [sic]." As they left Beck's house, Marshall said that he would "really hate to be robbed" with all that money on him. As soon as they walked out the door, Marshall yelled, "Oh no." Someone behind him then grabbed his left side, spun him around, and leaned him against a car which was some 11 feet away from the front door of his building. He identified his assailant in court as defendant Grenshaw. The scene was lit by light from the apartment windows, the hallway door light, and a street lamp some 10-15 feet away. Grenshaw held an army knife to his stomach, removed $30 from his right pocket, and said "I'm going to ask you one time where it is." He told Grenshaw "it" was in the other pocket. Grenshaw, who was holding the knife five inches from his stomach, then removed $700 from his left pocket. During this time a second man, who had a gun, grabbed Marshall and threw him against the building. He saw this man's face from a distance of about four feet, and identified him in court as defendant Burnett. Burnett and Grenshaw did not wear masks or other facial coverings, and did not in any way attempt to avert their faces from him. After the robbery, defendants fled by walking west on 56th Street and then running north on Marshfield. The entire occurrence had taken approximately two minutes. Marshall said, "we just got robbed," and they went upstairs and called the police. Marshall left saying that he was going to wait for the police downstairs. About three minutes later, he looked out the window and noticed that Marshall was gone. The police arrived about 20 minutes later, and plainclothes detectives arrived at approximately 7:45. After talking with them, he went with two of the policemen to 10 South Lockwood, the location of Marshall's brother's apartment. They did not see any of the defendants there, but they decided to stay parked in the police car in front of the building. After waiting for a few minutes, he saw the car which Grenshaw had thrown him up against coming down the street. The car was a black-over-green four door Oldsmobile. He told the police that Marshall was in the car with

other people who "possibly" were "the robbery men." The police turned on their flashing lights and sirens, and chased the car for approximately two blocks at a "nice little speed." He and the police got out of the car, and Marshall, who had been driving, began to get out of the Oldsmobile. He went up to that car and identified the passengers, Burnett and Grenshaw, as the assailants. The police then told him to go back to their car so he wouldn't get hurt. He did not see any money at the scene, but later saw $896 counted at the police station.

On cross-examination he stated that he described Grenshaw to the police as being six feet tall, having a beard and mustache, and wearing a blue skull cap, lightweight dark colored jacket and jeans. He described Burnett as being a male Negro about 25, six feet three inches tall, weighing 165 pounds and wearing a blue cap, three-quarter length black leather jacket, and high platform shoes. He also said that Burnett had a mustache and beard, but did not say that they were joined together or that he had a goatee. He conceded that although he saw Marshall's assailant, he "was more involved with" Grenshaw. He further conceded that when Grenshaw held the knife on him and went through his pockets, he did not look at Marshall or Marshall's assailant. He stated that he and the police spent about 45 minutes travelling from his apartment to 10 South Lockwood, and explained that they had a flat tire on the way. He estimated that they arrived at the Lockwood address within two hours after the incident.

*Walter Zamolewicz, Chicago Police Officer*

He is an investigator assigned to Area Three Robbery. On November 11, 1974, at approximately 8 p.m., he and his partner Officer Morley arrived in an unmarked car at 1617 West 56th Street. They interviewed Warren Beck, and then the three of them drove to 10 South Lockwood. After "a female voice" refused their entrance to the building, they re-entered their police car and waited at the scene for about 10 minutes. They saw a four-door black-over-green Oldsmobile come off of Madison Street, go south on Lockwood, and slow down in front of 10 South Lockwood. Beck then shouted out, "That's the car and those are the suspects. That's Mr. Marshall driving. Those are the suspects." The Oldsmobile sped away. Officer Morley turned on the lights and siren of the police car and pursued the Oldsmobile to 5416 West Jackson, where it was stopped. Jerrold Marshall got out of the car. Beck went up to the Oldsmobile and identified the two passengers as the men who robbed him. They were the defendants Burnett and Grenshaw. He told Beck to go back to the squad car, and Beck did so. After advising Marshall, Burnett and Grenshaw of their rights, Zamolewicz searched the car and found a large amount of money in the rear of the front passenger's seat, where Burnett had been sitting. He asked the three men whose money it

was and all three denied having any money. He took the money out, showed it to Burnett and asked, "Is this your money?" Burnett said, "One hundred is mine." He said, "That's all? You can do better than that" and Burnett said, "One hundred fifty is mine." At the 15th District Police Station Zamolewicz counted the money, and found that it amounted to $896. The money was in two packets, one containing $296 in older bills, and the other containing six new $100 bills. At the time of their arrest, Burnett was five feet eight inches tall, weighed 145 pounds, had a mustache and beard and wore a brown jacket, flowered shirt, and blue jeans. Grenshaw was five feet eight inches tall, weighed 135-145 pounds, had a full beard and mustache, and wore a dark blue skull cap, brown jacket, multicolored shirt and levis.

On cross-examination he estimated that they arrived at 10 South Lockwood at about 8:30 p.m. and denied having a flat tire or experiencing any other delay along the way. He admitted that no weapons were ever recovered in connection with this case; that it was dark when they saw the Oldsmobile, and that he could not make out the passenger's features.

*For the defense*
*John Novak, Chicago Police Officer*
On November 11, 1974, he and his partner, James Tynan, went to 1617 West 56th Street to investigate the robbery of Warren Beck. His partner conducted the interview with Beck and made out a report. He had no independent recollection as to whether Beck described his assailants as having beards or mustaches. After reviewing the police report, he stated that nothing in the report indicated that Beck described Burnett or Grenshaw as having a beard or mustache.

*Deborah Burnett*
She is Matthew Burnett's wife. On November 11, 1974, they and their children lived at 1847 West Lake Street. In order to save their money for the purchase of a car, they would save their "tens" and "twenties," convert them into $100 bills and keep the money in a jewelry box on a shelf in their bedroom. On the date in question there was approximately $900 in the jewelry box. At 10:30 or 11 a.m. her husband put his coat on and said he was going out to look for a car. She did not see whether he took any of their money with him. He returned home at about 7:30 p.m. Approximately 10 minutes later Jerrold Marshall, a friend of her husband's, came to their home. After the two men talked, her husband put on his coat, said he would be right back, and left. He did not return that night.

On cross-examination she acknowledged that they did not attempt to take any of the money they saved to a bank. She conceded that she did not know how many $100 bills were in the jewelry box. She conceded that she did not know where her husband went, who he was with, or what he

was doing on the date in question. She acknowledged that she wasn't sure about what her husband was wearing, but described it as a dark flowered shirt, short black jacket, blue cap and gym shoes or loafers.

*Michael Bridges*

He is Jerrold Marshall's first cousin. On November 10, 1974, he gave Marshall close to $300 to purchase some marijuana.

On cross-examination, he conceded that he and Grenshaw were formerly roommates and that he is a friend of Burnett. He acknowledged that he did not know the denominations of the money he gave to Marshall, but stated, "it was big bills."

*Curtis Jackson*

In November of 1974, he attended DeVry Institute of Technology with Jerrold Marshall and Warren Beck. On November 11, at a table in the school cafeteria, he heard Beck ask Marshall if he had access to a large quantity of marijuana. When Marshall said he did, the two agreed on a price of $145. There was no discussion of stereo components.

On cross-examination he admitted that both before and after November 11, he discussed purchasing or selling drugs approximately 50 times. He admitted that he and Marshall were good friends.

*Jerrold Marshall*

He has known Burnett and Grenshaw for nine to 10 years. They did not rob him on November 11, 1974. On that date he was a student at DeVry Institute of Technology. At a table in the cafeteria, he told Warren Beck and several other classmates that he "got in on a deal on some marijuana" the night before. Beck asked if he could purchase seven pounds of marijuana. He agreed that Beck could at a cost of $700. He had gathered $685 which included his own money, approximately $300 from his cousin, Michael Bridges, and some money from a David Birage. He was to purchase the marijuana from a classmate named Stanley Sakinis. He did not accompany Beck after school to Beck's house, or to the Standard Heritage Bank or to his brother's house. Beck gave him his phone number so he could call and make the final arrangements for "the deal." He called Beck that evening, and then drove to his apartment. He drove a 1970 black-over-green Oldsmobile and arrived at about 6:30 p.m. After he called Sakinis, he and Beck left the apartment. As they were walking down the stairs, they were robbed by two men. He had never seen these men before, and does not know who they were. The man who robbed him took $585, leaving him with no money. After the robbery, he said, "Let's call the police" and "God damn it we just got robbed." He and Beck then went back up to the apartment and he called the police. They asked him for the address, but Beck, who was "a dealer," told him not to give his address to the police. He told the police he would be standing on 56th Street just west of Ashland. After waiting approximately 15 minutes,

and trying unsuccessfully to flag down a marked police car, he left the scene and drove to Matthew Burnett's house. He told Burnett and his wife that he had been robbed and wanted to go back to Beck's house. Burnett went with him, and they drove to Louis Grenshaw's residence at 5810 Huron. The three of them then went to the "Lime Room" at 5600 West Madison, where Burnett paid for three rounds of drinks. They left after about an hour, and were "riding." As he crossed Quincy and headed south on Lockwood, he saw lights flashing behind him. He made a right turn, saw that the police were behind him, and immediately pulled over to the curb, in the 5400 block on Jackson. As he was talking to Officer Zamolewicz, Warren Beck ran up to the car and said, "Yes, that's them." He told the police that he had been robbed, and that he didn't wait for them because it wasn't all his money.

On cross-examination he acknowledged he had either $585 or $685 on him when he left Beck's apartment, and wasn't sure of the exact amount. He acknowledged that he pleaded guilty to robbery on March 12, 1973, that he was sentenced to three years probation, and was on probation at the time of the occurrence. He admitted that one of the terms of his probation was that he not violate any laws, and that he knew that dealing in large quantities of marijuana violated the law and his probation. He admitted that he lied when he testified under oath at a preliminary hearing that he was with Beck because he was selling some electrical equipment. He admitted that on the way from Beck's residence to Burnett's he saw some police cars, but did not try to stop them. He acknowledged that there were phones at Burnett's apartment and at the "Lime Room," but that he did not use them to call the police.

*Defendant Matthew Burnett in his own behalf*

He, his wife Deborah and their children live at 1847 West Lake in Chicago. On November 11, 1974, at approximately 11 a.m. he took $925 from his wife's jewelry box and went out to shop for a car. He returned home at 7:30 p.m. At about 7:45 Jerrold Marshall arrived. After they had a conversation, he went with Marshall to Grenshaw's house, at 5900 West Huron. He had known Marshall and Grenshaw for six or seven years. After informing Grenshaw that Marshall had been robbed, they decided to go to the "Lime Room" for drinks. He still had the money he had taken to go shopping for a car, and he paid for the drinks. They left and drove to Lockwood. Marshall "parked a little bit," but noticed that there were no lights on in his brother's apartment, and began to pull away. The police then came upon them and placed them under arrest. Officer Zamolewicz searched him and took some money out of his pocket. Zamolewicz questioned him about the money, and he said he had worked for it. He never told Zamolewicz that only $100 or $150 was his, and never denied that it was his money. He did not rob Marshall or Warren Beck on

the day in question. At that time, he was five feet eight inches tall, and had a goatee and mustache.

On cross-examination, he estimated that the $925 he took with him on November 11, 1974, included six or seven $100 bills. He admitted that he was mistaken when he testified under oath at the preliminary hearing that he returned home from car shopping at about 6:30, and that he didn't see the police officer take his money.

*Carolyn York*

In November of 1974, she was living with Louis Grenshaw at 5910 West Huron. On November 11, they spent the entire day together in the apartment. At 7:45 or 8 p.m., Jerrold Marshall and Matthew Burnett came over. After a conversation, they left with him.

*Defendant Louis Charles Grenshaw in his own behalf*

In November of 1974 he lived with Carolyn York at 5910 West Huron. He spent November 11 with her at the apartment. Shortly before 8 p.m. Jerrold Marshall and Matthew Burnett came by. They all had drinks at the "Lime Room" and then went to Marshall's brother's apartment on Lockwood. They saw he wasn't home and started to pull away when some lights started flashing in back of them. Marshall said, "Well, that might be the police there." He said, "Man, don't stop here on this dark street. Let's go on to Jackson." After they turned onto Jackson and stopped, the police came over. A black man also came up, peeked in the car, and said, "Those are the men." The police told him to get back in the car. The police searched them and took a handful of money out of Burnett's pocket. He is five feet nine inches tall and wore a mustache and beard. He did not rob Beck or Marshall.

On cross-examination he conceded that he was in the Marine Corps and received a general discharge, which is less than an honorable discharge. He admitted testifying at the preliminary hearing that the police officer pulled the money out of the car. He denied wearing a blue skull cap when arrested, and acknowledged that he wore a flowered shirt and a brown jacket.

*For the State in rebuttal*
    *Stanley Sakinis, Jr.*

He attended DeVry Institute of Technology for 2½ years and was a classmate of Jerrold Marshall's. He never had any conversation with Marshall or with Warren Beck concerning the sale of marijuana.

On cross-examination he denied ever having a conversation with Marc Kadish, either on the phone or in person.

*For the defense in surrebuttal*
    *Marc Kadish*

He was Jerrold Marshall's attorney. He dialed Stanley Sakinis' phone

number and after Sakinis identified himself, he talked with him on the phone. Sakinis told him that in November of 1974 he had been involved in a negotiation for the sale of some marijuana with Jerrold Marshall and Warren Beck while they were students at DeVry Institute. Sakinis said he would be willing to make the admission in court.

On cross-examination he admitted that the phone number he dialed was given to him by Jerrold Marshall, and that he had never talked to Sakinis or met him before.

OPINION

■■ Defendants first contend that the testimony of Warren Beck, the sole identification witness, was weak, unreliable, and insufficient to support their convictions beyond a reasonable doubt. In support of this contention, they stress that although Beck told the police that Grenshaw and Burnett were, respectively, six feet and six feet three inches tall, both were shown at trial to be five feet eight inches tall. Further, they argue that Beck did not describe their clothing with complete accuracy, and that he did not tell the police that both of his offenders had mustaches and beards. We note that Beck testified that he did describe both offenders as having mustaches and beards. The only evidence offered by defendants to refute Beck's assertion was the testimony of Police Officer John Novak. Novak admitted that he did not interview Beck and had no independent recollection as to how Beck described the offenders. After looking at his partner's police report, he testified that the report itself did not indicate that defendants were described as having beards and mustaches. However, this testimony does not specifically negate the proposition that Beck did make such a description. More importantly, where a witness' identification is positive, precise accuracy in describing facial characteristics or attire is unnecessary. (*People v. Jackson* (1974), 23 Ill. App. 3d 945, 320 N.E.2d 591.) The inaccuracies cited by defendants herein are minor discrepancies which would only affect the weight of the witness' testimony and do not destroy the credibility of his identification. (See *People v. Carroll* (1973), 12 Ill. App. 3d 869, 299 N.E.2d 134, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1144, 94 S. Ct. 3180; *People v. Calhoun* (1971), 132 Ill. App. 2d 665, 270 N.E.2d 450.) The identification testimony of a single witness, even if it be that of a crime victim, is sufficient to convict if the identification is positive and the witness is found to be credible. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239.) The test of a positive identification is whether the witness was close enough to the identified person for a sufficient length of time under adequate conditions to observe and later make an identification. (*In re Williams* (1974), 24 Ill. App. 3d 593, 321 N.E.2d 281.) In the instant case, Beck had an ample

opportunity to observe defendants throughout the robbery which lasted approximately two minutes. The area where the parties stood was well lit. Beck was face to face with Grenshaw, and within four feet of Burnett. Neither defendant attempted to in any way hide, mask, or avert his face. These factors clearly support Beck's positive in-court identification. We note that defendants' denials of involvement and other defense testimony contradicting Beck created questions of fact and raised an issue of the credibility of the witnesses. However, resolving questions of fact and determining the credibility of witnesses is the function of the jury. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) A determination of guilt by a jury will not be set aside by a reviewing court unless it is palpably contrary to the weight of the evidence or so unsatisfactory as to cause a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed 2d 533, 98 S. Ct. 1513.) In addition to the positive identification testimony adduced at trial, it was shown that defendants were apprehended shortly after the commission of the crime, in a car identified by Beck as having been at the scene, and in possession of a large amount of money. This money included six $100 bills, which matched the amount and denomination of currency that Beck had earlier in the evening. While defendants offered an explanation at trial for the possession of the money, the jury was entitled to consider that explanation in light of Officer Zamolewicz's testimony that at their arrest, defendants offered no explanation for the money and even denied that it was in their possession. Further, both Zamolewicz and Beck indicated that defendants attempted to flee the police when first signalled to stop. In light of all of the evidence referred to above, we conclude that there was an ample basis for the jury to find defendants guilty beyond a reasonable doubt.

■■■ Burnett also contends that he was denied a fair trial by co-defendant Grenshaw's testimony that before they went to the "Lime Room" for drinks, Burnett stopped and purchased some marijuana. Burnett argues that this was evidence of an unrelated crime, and was prejudicial because it tended to show that he had a criminal disposition and a propensity to commit the crime charged. (See *People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506.) However, the trial record shows that Burnett's only objection and motion for a mistrial came after the reference to marijuana had been made and the questioning had proceeded to another point. Because defendant failed to make a timely objection at trial, he has waived consideration of the allegedly prejudicial testimony on appeal. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) Further, it appears from the record that when an objection was made, the trial court clearly and specifically instructed the jury to disregard the testimony regarding Burnett's participation in the purchase

of marijuana. Although evidence of unrelated misconduct or crimes and comment thereon may be so highly inflammatory that such admonition by the trial court may fail to effect a cure (see, *e.g.*, *People v. Deal* (1934), 357 Ill. 634, 192 N.E. 649), an error is commonly deemed to be cured where the defense objections have been sustained during the course of trial and where the jury is instructed to disregard the matter. (See, *e.g.*, *People v. Donald* (1977), 56 Ill. App. 3d 538, 371 N.E.2d 1101; *People v. D'Argento* (1969), 106 Ill. App. 2d 36, 245 N.E.2d 501.) Where it does not appear that the remarks complained of influenced the jury in a manner that resulted in substantial prejudice to the accused, reversal is unwarranted. (*People v. Stahl* (1962), 26 Ill. 2d 403, 186 N.E.2d 349.) In light of the isolated nature of the marijuana reference and the trial court's instruction, any error which may have occurred must be considered harmless. See *People v. Terry* (1976), 38 Ill. App. 3d 517, 347 N.E.2d 869.

■■ Finally, Grenshaw contends that the trial court erred by giving a misleading jury instruction, and by refusing to give a special "reasonable doubt" instruction that he had offered. As to the first contention, it is clear from the record that defendant made no objection to the allegedly misleading instruction when it was discussed or offered at trial. His failure to do so denied the trial court a chance to correct any possible defect, and waived the issue from appellate review. (See *People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817; *Dean v. Keith's & Ralph's Tavern, Inc.* (1975), 25 Ill. App. 3d 970, 324 N.E.2d 7.) In arguing that the instruction he offered should have been given to the jury, Grenshaw characterizes it as covering "the area of reasonable doubt as to identification" and states that it was "modeled" after instructions adopted by the United States Court of Appeals for the District of Columbia Circuit in *United States v. Telfaire* (D.C. Cir. 1972), 469 F.2d 552. Grenshaw concedes that in *People v. Attaway* (1976), 41 Ill. App. 3d 837, 354 N.E.2d 448, we held that an instruction based on *Telfaire* had been properly refused. He nevertheless argues that his instruction should have been given because it was a "greatly shortened version of the *Telfaire* instruction" and, unlike the instruction considered in *Attaway*, did not violate the rule that instructions must be "simple, brief, impartial, and free from argument." (Ill. Rev. Stat. 1977, ch. 110A, par. 451(a).) Defendant's argument is unpersuasive. In *Attaway* we noted that the Illinois pattern jury instructions on witness credibility and the State's burden of proof (Illinois Pattern Jury Instructions, Criminal, No. 1.02 (1968) (hereinafter cited as IPI Criminal) IPI Criminal No. 2.03) had been given, and that these instructions had been held sufficient to instruct the jury as to the defense of mistaken identification. (*People v. Neeley* (1974), 18 Ill. App. 3d 287, 309 N.E.2d 725.) We then concluded that:

"[T]he procedure approved by our supreme court is a fair, realistic

method in cases involving trial identification and * * * the trial court did not abuse its discretion in refusing to give this [*Telfaire*] instruction since the Illinois pattern instructions on credibility and burden of proof are sufficient." (41 Ill. App. 3d 837, 854-55, 354 N.E.2d 448, 462-63.)

In the instant case, as in *Attaway*, the jury was given the Illinois pattern instruction on witness credibility and the State's burden of proof (IPI Criminal No. 1.02; IPI Criminal No. 2.03) as well as IPI Criminal No. 14.02, which instructs on the elements of the crime of armed robbery. In light of the above, we conclude that the jury was adequately instructed, and that Grenshaw's proposed instruction was properly refused.

Based on all of the above, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.