THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WALTER B. SMITH *et al.*, Defendants-Appellants.

(No. 12146; )

Fourth District—May 2, 1974.

Paul Bradley, Deputy Defender, of Chicago (Robert E. Davison, Assistant Appellate Defender, and Theodore M. Becker, Senior Law Student, of counsel), for appellants.

Richard J. Doyle, State's Attorney, of Danville (John R. McClory, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE SMITH delivered the opinion of the court:

Defendants were convicted of rape and burglary and sentenced to concurrent terms of 30-60 years and 5-15 years respectively. For reversal they urge, (1) insufficiency of proof, (2) denial of the effective assistance of counsel, (3) denial of their motion to suppress evidence, and (4) remarks by the court and arguments of counsel. They question, too, the severity of the sentences and request our interposition in reducing them.

That the burglary and rape occurred is not questioned. Questioned is whether defendants were responsible. There is no direct evidence, as the victim could not identify her assailants, for not only was it at night when she was alone, but a blanket had been thrown over her head. The house was ransacked and she was tied with an alarm clock cord. One assailant left and the one stayed behind left when a car horn honked in front. Upon untying herself she noticed the time to be around 3:15 A.M.—the clock having stopped. She immediately called her sister and the police, and upon her return from the hospital she discovered her billfold

containing personal pictures, some silver certificates and Kennedy half dollars were missing. Entry was gained by removing a screen from her sister's room.

Unbeknownst to her assailants their activities outside of her house had not gone unnoticed even at that early hour. A neighbor had been awakened around 2:30 by music and saw a light blue car with an Illinois license number parked near his house. He saw two men alight from the car and walk towards the victim's home. Later he saw a man put something in the trunk of the car, and walked over and asked him what he was doing. He had already taken the license number. Following his inquiry, that person, identified at the trial as the defendant Clayton, drove away towards the victim's house and the neighbor heard the car horn honk and a door slam. He hastened over in time to see the same car with two persons driving away. Another neighbor, upon being awakened by the first one, observed the same events. He likewise identified Clayton.

The license number of the car was broadcast over police radio with a description after the victim had given the alarm. An officer observed the car in a parking lot of a housing project where the mother of one of the defendants lived, his observation being based upon a report by another officer that the suspect car had been located and that its occupants had gone into the adjacent house. The officer noted that the radiator was still hot, went into the house which was lighted, and found and arrested the defendant Smith. The arrest was based upon the identification of the officer who had first found the car and radioed its location to the arresting officer. This was shortly after 4 A.M. on the day in question. Clayton was arrested some 13 hours later and had on his person two Kennedy half dollars, a silver certificate and the keys to the car— its owner testified that there was only one set. Another witness testified that both defendants came to her apartment around 3:30 A.M. "looking afraid and sweating" to talk to the owner of the car. But he was drunk and couldn't be roused. Defendant Smith was heard to say by this witness, "We've got to split, Man." They left with this witness observing both of them driving away "going very fast". Incidentally, Clayton was present when Smith was arrested but he failed to give his correct name.

Prior to the arrest of Clayton in the late afternoon the police had been alerted by this witness as to the events just described. The photographs taken from the victim's wallet were recovered in the area of this witness' house, and though torn up, were so identified. Latent fingerprints were found on the screen removed from the sister's bedroom, and an expert found some 12 similarities between them and those of Clayton. This identification was less than positive, as such things go, and though

objected to, was admitted. Of course, there was no positive identification that the silver certificates or the Kennedy half dollars were the very same ones stolen from the victim's home.

Shortly after the victim gave the alarm, her bed clothing was taken from her room by the police and hair samples collected. These compared structurally—"morphologically"—as to color and characteristics similar to both defendants and the victim. Other tests relating to blood on the underclothing of one of the defendants which was the same as that of the victim—B, while the blood grouping of the defendants was O.

The defense was alibi and both defendants testified as to their whereabouts. Clayton testified that he came to have possession of the keys after Smith's arrest, having taken the same from a table where the latter was arrested in order to get the car released from the police pound. A question was raised to the propriety of defendant Smith's mother testifying as she had violated the exclusion order and had been in the courtroom during the trial. The court announced in the jury's presence that she would not be allowed to testify, then relented, but she testified to nothing really germane to anything including the alibis, hence any discredit to this witness occasioned by the court's announcement, went for naught. Although Clayton testified, as we have seen, that he picked up the keys to the car from a table, he had told the police at the time of arrest that he didn't know where he got them.

■■■ This brief recital of the evidence—with much left out—lays to rest pretty well the argument that there was insufficient evidence on which to bottom the convictions. True, as we have said, there was no direct proof—it is all circumstantial—but the pieces fit together. Obviously, no one or more of the circumstances standing alone would be enough. But, if we take each one in its context, we have, as they say, a totality of facts, from which very reasonable inferences could be drawn that the defendants did the deed or deeds they were charged with. Again, briefly, an automobile is noticed in the early morning hours parked close to the house of the victim; two men are seen walking towards her house; the license number is noted; one man returns and is accosted as to what he is doing there, having been seen to put something in the trunk of the car—his reply was that he was helping his brother get a car started in the next block; he drives off, stops near the victim's house, a horn honks, a door is slammed and the car leaves but is next observed in another section of the city adjacent to a house in which both defendants are present. In the meantime, the victim has been twice raped, her house ransacked, one assailant leaves, the next leaves after a horn honks, her billfold is gone along with some Kennedy half dollars and silver certificates. Fragments of some pictures in the wallet are found near

the house where both defendants were observed and Clayton when arrested has the keys to the same car, and matching half dollars and a silver certificate. On top of all this we have the neighbors identifying one of the defendants as one of two persons who were in the car during the early morning hours of the day in question and who walked over in the direction of her house, and then returned, driving away, followed shortly by a honking horn and slamming door. Without more, these are circumstances which provide a reasonable hypothesis of guilt and do not, as defendants argue, provide a reasonable hypothesis of innocence, or rather, do exclude any reasonable hypothesis of innocence. True, from each single fact there is an hypothesis of innocence, but from all the facts—the totality—we can safely say, we think, that there is no hypothesis of innocence that can be characterized as reasonable. If the jury had chosen to disbelieve the State's witnesses that is one thing—then there would have been insufficient credible circumstances on which to predicate guilt. On the other hand, if they chose, as they apparently did, to believe the witnesses, at least as to the salient circumstances, it was certainly their prerogative, and if so the proof was there on which to fasten guilt. To argue, as defendants do, that these facts are incredible, leaves us with the only answer possible, that such determination is not for us but for the jury. A paucity of circumstances we can weigh and find them wanting on our scales, but we cannot and will not weigh the very credibility of the witnesses who testified and therefore the facts they mouth, except in the most extraordinary circumstances.

██ In our narration and in coming to our conclusion, we have not applied as an overlay to these circumstances the scientific proof. While certainly not absolute as that term is used in scientific circles, the hair comparisons, the blood groupings, and the fingerprint comparison were admissible and the weight accorded them up to the jury. But triers of the facts here had enough to go on whatever view they took of the expert testimony, and they likewise, in our opinion, had the right to disbelieve the alibis. The parameters of responsibility accorded to a jury in a criminal case permits them to disbelieve witnesses and if it turns out, as it must have here, that they chose to view the alibi testimony as incredible, and the State's evidence as credible, then such choice by them is simply a reaffirmation of what our system permits juries to do. We conclude, that the evidence was more than ample on which a jury could conclude that the defendants did burglarize and rape the victim's habitation and person.

██ It follows from our recitation that the arrests were lawful and, if so, that which was seized and taken thereafter was lawful. The evidence objected to consisted of physical evidence taken from the defendants after

the arrest such as fingerprints, combings of hair and clothing, and keys and currency from Clayton. The evidence, as we have said, was more than sufficient to furnish the basis for probable cause for the arrests. This point therefore need not detain us and we conclude that the court was right in denying the motion to suppress these items of evidence.

■■ Complaint is made here that the public defender appointed to represent both defendants betrayed the best interests of his clients, and particularly Clayton, by arguing, in essence, that if anybody was guilty, it was Clayton and not Smith. We are told that counsel for both found it necessary to try to "sell off" one defendant in an attempt to save the other. It needs no citation of authority that the one 'sold off', if such fact is true, has been denied the effective assistance of counsel—a right guaranteed to all. After all, where there are antagonistic defenses, we do not permit the State to sit back and watch the defendants convict each other, or as is asserted here, watch one convict the other to save himself.

■■■ In our analysis of this point, we must of needs start off with an overriding and inexorable proposition—the defense of each defendant was the same, that is, neither did it and neither said the other did. In their brief they point the finger of guilt at the owner of the car—arguing that such a hypothesis is reasonable and if it is, such also redounds to their benefit in that it provides them with a reasonable hypothesis of innocence. But such is not the case, in our view of the evidence. Consonant with the sublime lack here of any disparity as to defenses is the rule in Illinois that defendants jointly indicted should be tried together and nowhere that we know of is there is a requirement that a given number of defendants must equal a like number of attorneys representing them. Obviously, an attorney who represents more than one defendant should and indeed must devote his efforts to them equally and without deprecating one while exalting the other. Our reading of the record leaves us with the distinct impression that the attorney representing them did so vigorously and without giving an edge to either. It was not his fault that the evidence was stronger against Clayton. Multiple defendants, almost by definition, will produce disparities, qualitatively and quantitatively, as to the proof against each. It is a *non sequitur* to say that such disparity *ipso facto* results in disparity of effort devoted to such defendants if they have the same attorney. In *People v. McCasle*, 35 Ill.2d 552, 221 N.E.2d 227, we find this apt statement—apt both in the sense of the applicable law and the factual context which occasioned its enunciation:

> "Nevertheless, defendant now contends that the court should have appointed separate counsel for him on its own motion. He predi-

cates this claim upon the proposition that Thaddic might have committed the robbery alone or with an unidentified third party, and that Thaddic should have been vigorously cross-examined by an attorney representing McCastle's interests alone. * * *
There was no inconsistency in these defenses, and it was not improper for the same public defender to contemporaneously represent both defendants. As a general rule, jointly indicted defendants should be jointly tried unless their defenses are antagonistic, and a severance is neither required nor authorized where their defenses are not inconsistent. * * * *"

The few excerpts culled from the record of the argument which might, standing alone, raise eyebrows—such as why is Smith a defendant though "we know why Clayton is a defendant in this case", when read in context dissipates any doubts otherwise present. An attorney can argue the innocence of his clients and totally represent them both and at the same time argue that though innocence conceptually is an absolute, one can be more innocent than the other—so far as proof.

■■ In closing argument the State alluded to the testimony of one of the experts that the presence of sperm verified the fact that both defendants had intercourse with the victim. This expert did, however, testify as to presence of sperm, and that it could have been there, as the expert testified for more than 48 hours, does not preclude the State's attorney from drawing the unfavorable inference that he did. It is an arguable inference, particularly with all the other evidence and one that can be properly made. Because the prosecutor draws such an inference doesn't mean that it is true and the jury doesn't have to accept it as true. Likewise, as to the attacked remark by the State that the blood type discovered on defendant Clayton's underpants was entirely consistent with the victim's blood type. This is not a misstatement as defendants allege. There was expert testimony, as we have seen, that the victim's blood characteristics was in a B grouping and there was testimony that the blood type found on the underpants was B. That the blood may have come from another source, doesn't preclude an argument that it came from the victim, and thus prevent the State from arguing and drawing the inference which connects the victim with the defendant.

■■ Finally, defendants contend that the sentences were excessive and we should exercise the power bestowed upon us by Rule 615(b)(4) of the Supreme Court and reduce them. Defendant Clayton was 25 years old and defendant Smith 33. Both had prior criminal records. Indeed, Clayton had just been paroled on a conviction for armed robbery. That rape is a heinous offense cannot be gainsaid—it is a Class I felony. We can appreciate, therefore, the court's observations prior to sentencing—

"that under most instances the minimum sentence given for an offense where the court has indeterminate sentencing authority should not exceed one-third of the sentence. I am nevertheless faced in this instance with the type of crime which represents a substantial threat and danger to the community and that in the opinion of the court requires some deviation from this stated principle." Our power to reduce, as has been said, should be used with caution and circumspection. (*People v. Caldwell*, 39 Ill.2d 346, 236 N.E.2d 706.) Here, we think this same caution and circumspection should stay our hand.

We took with this case a motion by the defendant to correct the title of the case to show the correct name of the defendant to be Clayton Nick. The motion is allowed and the title of the case now reflects the change.

Accordingly, the judgments appealed from are affirmed.

Affirmed.

SIMKINS and TRAPP, JJ., concur.