THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NICK CHARLES FREEMAN, Defendant-Appellant.

Fourth District   No. 14519

Opinion filed May 12, 1978.—Rehearing denied July 6, 1978.

Richard J. Wilson and Donald T. McDougall, both of State Appellate Defender's Office, of Springfield, for appellant.

William J. Scott, Attorney General, of Springfield (Donald B. Mackay and Philip Weber, Assistant Attorneys General, of counsel), for the People.

Mr. JUSTICE MILLS delivered the opinion of the court:

A jury found Freeman guilty of armed robbery, the trial court sentenced him to 8 to 16 years, and this court affirms.

## ISSUES
## I. ASSISTANCE OF COUNSEL
## II. *VOIR DIRE*
## III. SUPPRESSION OF I.D.
## IV. SENTENCING

## FACTS

The facts relevant to certain of the issues on appeal will be summarized within the analysis of that question. But a brief outline of the rather undeniable facts of defendant's guilt in the instant case will afford an initial overview.

Defendant Freeman and a co-defendant, Winston, were charged by information with the crime of armed robbery at an "adult" bookstore, and after counsel was appointed, a rather complete discovery between the parties took place. At the conclusion of a 4-day trial, the jury returned a guilty verdict against Freeman and an innocent verdict for Winston.

At trial, John Scott testified that he saw an unfamiliar car, a red Pontiac, in his neighborhood on the evening of January 5, 1977, and noticed two individuals running from the "adult" bookstore in military fashion (ducking down, etc.). The bookstore attendant, Terry Gilliland, testified that about 7 p.m. that evening, two people came in the back door of the bookstore, their faces covered, one with a ski mask and the other with a nylon stocking. The former had a handgun and the latter carried a shotgun. At the robbers' directions, Gilliland opened the cash register and

a display case containing quarters. The robbers then directed him to get into a movie booth inside the store. During the robbery, he stood within 5 feet of one of the robbers for about 30 seconds. Approximately $440 was taken. Gilliland identified defendant Freeman as the robber with the shotgun and testified he had never identified the defendant before the date of the trial but had seen defendant in the hall the day before trial. Gilliland further testified that he had been shown pictures of the two defendants by the prosecutor the day before trial and that he had been shown no other pictures at the same time. It was after viewing the pictures that he saw the defendant.

Officer Lockard, later on the day of the robbery, spotted the Pontiac in question parked in a trailer park. He followed some footprints from the car to a shed (there were some three or four inches of fresh snow on the ground) where he discovered a toy pistol and the shotgun wrapped in a green raincoat.

Officer Krueger described a conversation with Freeman (after *Miranda* warnings were given) where defendant admitted driving the red Pontiac behind the store, that he was wearing a green coat, gloves and nylon stockings and carrying a shotgun (over-and-under barrel configuration). Defendant also admitted to Officer Krueger that he had ordered the manager into a movie booth and after leaving the store, broke the gun "down." Defendant further admitted to Krueger that he parked the car in the trailer park and went into the trailer of co-defendant Winston's wife.

Freeman was found guilty. Winston was not.

## OPINION

### I

### WAS DEFENDANT DENIED EFFECTIVE ASSISTANCE OF COUNSEL?

This issue is grounded on a conflict of interest proposition. Defense arguments revolve around the fact that even though defendant Freeman and defendant Winston were represented by different counsel, since both of the attorneys were from the public defender's office, both defendants were being represented by "the office" rather than individual attorneys. At trial, a motion *in limine* was granted so that the jury was kept from knowing that defense counsel for both defendants were from the public defender's office. During the course of the trial, defense counsel for both defendants were free in assisting each other on arguments relative to motions of the other counsel. (An example would be that Winston's defense counsel aided in setting forth reasons to support Freeman's motion to suppress the in-court identification. Likewise, Freeman's

counsel helped put forward reasons why a certain piece of evidence harmful to defendant Winston should be inadmissible.) It is really undisputed that the joinder of both defendants in this case could only help Freeman's chances of keeping his confession away from the jury.

Defense counsel tries to argue that the trial judge should have realized the possibility of a conflict in this case and have ordered the appointment of different counsel (and not necessarily a severance), or in the alternative, that actual prejudice was shown in the attorneys' handling of the case. During final argument, Winston's counsel suggested that defendant Freeman could have picked up one of the "guns" used in the robbery (a toy gun from Winston's son's playroom). This is—it is argued—actual prejudice. In addition, counsel on appeal points to another remark, this time made by *this defendant's (Freeman's) trial counsel* at the start of closing argument. The statement which draws so much attention in this case was:

> "One word about Mr. Winston, who is not my client, before I start. I would submit to you that the evidence in this particular case is very much lacking as to this particular individual and a verdict of guilty as to Mr. Winston would appear to be a travesty of justice and I will confine my arguments from this point on as to my client, Nick Freeman."

It is argued that where defense counsel volunteered that it would be a "travesty of justice" if co-defendant Winston were convicted, defense counsel was implicitly admitting to the jury that it would not be a "travesty of justice" if his own client were found guilty!

■■■ It is undisputed that every defendant has a right to the undivided loyalty of counsel and that representation will be found lacking where it is hobbled, fettered or restrained by a commitment to others. (*People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441.) The cases seem to indicate, however, that a "commitment to others" is one where the commitment is to a person or entity somehow interested in conviction. (In the instant case, co-defendant Winston was not, nor would not be, interested in Freeman's conviction.) Rather, we see this to be a situation where the test is that set forth in *People v. Precup* (1977), 50 Ill. App. 3d 23, 365 N.E.2d 1007, *appeal allowed* (1977), 66 Ill. 2d 641. In *Precup*, this court stated that there are no instances found of a rule finding a *per se* conflict where representation of two defendants is by one counsel and that an *actual* existing conflict of interest between the defendants must appear. We view defendant to be correct when he argues that it is the *office* of the public defender which represents a client in court through individual assistants. (*People v. Benford* (1975), 31 Ill. App. 3d 892, 335 N.E.2d 106.) Practically speaking, therefore, under *Benford,* both defendants were

represented by one entity. However, as stated in *Precup*, there must be an *actual* existing conflict between the defendants. See also *People v. Fuller* (1974), 21 Ill. App. 3d 437, 442, 315 N.E.2d 687, 690.

■■ The State's argument that the flood gates would be opened if this court were to find that the public defender may not represent more than one defendant in any criminal action involving multiple defendants is totally void of merit. As was stated by Mr. Justice Crebs in *People v. Bain* (1974), 24 Ill. App. 3d 282, 285, 320 N.E.2d 426, "Justice cannot be weighed in dollars and cents, nor in convenience to the State." However, since it appears manifestly clear that there is no *per se* rule in Illinois prohibiting the public defender to appear on behalf of more than one defendant in any situation (absent actual prejudice), this argument by the State need be pursued no further.

It is apparent from a full review of the report of the trial proceedings that the defenses put forward by Freeman and Winston were not antagonistic on their face. Both denied guilt. Neither testified during trial. No statements of Freeman implicated Winston, no statements of Winston implicated Freeman. The only scrap of evidence even suggesting prejudice would be the "travesty of justice" statement by Freeman's counsel during closing argument. And we are not aware of any case or opinion that has found actual prejudice merely from counsel's *argument*—it is the *evidence* in the record that must establish the actual prejudice. Here there was none. And, as our court's Mr. Justice Sam Smith stated in *People v. Smith* (1974), 19 Ill. App. 3d 138, 145, 310 N.E.2d 818, "An attorney can argue the innocence of his clients and totally represent them both and at the same time argue that though innocence conceptually is an absolute, one can be more innocent than the other—so far as proof." It seems that this is what happened in this case.

■■ We do not interpret the remark to be a confession by counsel that justice would not be mortally wounded if his client were found guilty. We certainly grant that were counsel to "have his druthers" (hindsight being 20-20) he would have opted for deleting such argument, but we cannot view the remark as any sound foundation upon which to build *actual* prejudice.

## II

DID THE TRIAL COURT ERR IN ALLOWING CERTAIN QUESTIONS TO BE PUT TO PROSPECTIVE JURORS?

During *voir dire,* the prosecutor asked the following question:
> "Would either of you (two jurors) find it impossible in your own minds to find a verdict of guilty if there were no eyewitness testimony presented to you from the witness chair?"

Defense counsel's objections to the question were overruled. Later in the *voir dire,* the prosecutor asked the following question of a juror:

> "[Would you] find it difficult in your own mind to find a verdict of guilty if a good portion of the evidence which you heard is what is called circumstantial evidence?"

There was no objection to this second inquiry.

Defendant argues that the first question narrated implanted in the minds of the jurors a duty to return a verdict of guilty even if there was a reasonable doubt of innocence and that the second question related gives the parties a hypothetical set of facts and asks for a jury pledge.

This is a counterfeit issue.

First of all, defendant is attempting to say that a question concerning circumstantial evidence prejudiced him when the facts of the case show direct evidence to his guilt in the forms of (a) an eyewitness identification and (b) his confession. Secondly, of the two jurors asked the first question, one was excused from the panel by the State, and the other did not answer the question—nor was she requested to.

As can be seen by the second question, the line of questioning does not really ask for a pledge, but rather to see if the law would be followed. We would further note that defense counsel is hard-put to complain of questions on following the law because the record recites various *voir dire* questions asked by both defendants as to whether the jury would consider a finding of innocent to be as valid an upholding of the law as the finding of guilty.

■■ To us, the prosecutor's questions only went to see if the juror would be prejudiced against following the stated law of Illinois regarding conviction by circumstantial evidence.

This issue is unmeritorious.

(We note—parenthetically—that the defendant used only three challenges in the *voir dire.*)

## III

### SHOULD THE IDENTIFICATION OF DEFENDANT BY THE VICTIM HAVE BEEN SUPPRESSED?

Under the broad heading of trying to suppress the identification by Terry Gilliland, two arguments were made.

First, defendant argues that the suggestive procedures of the day prior to trial rendered Gilliland's eyewitness identification inadmissible. The State counters that there was an adequate basis for the trial court to determine that the identification had an independent origin other than the pretrial procedures, and (alternatively) urges the harmless error rule,

pointing once more to defendant's confession plus corroborating third-party evidence.

Second, it is argued that the prosecution violated the State rules concerning discovery and exculpatory matter (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194), and, on that separate basis, the identification should have been suppressed. The State says that *Brady* has not been violated and again that, even if violation occurred, the error was harmless.

Now let us look at the specific facts surrounding the ID issue. The store attendant, Terry Gilliland, testified to the robbery and identified defendant Freeman as the robber holding the shotgun. Still before the jury, and during direct examination, Gilliland said he had never identified the defendant in any formal proceeding before that time, that he saw defendant in the hall the day before, and that he had also been shown pictures of both defendants by the prosecutor, Mr. Parkinson. At that point, the court moved into chambers with counsel and took under advisement a motion for mistrial and to suppress identification. Further examination of Gilliland in chambers revealed that he was shown the pictures by Prosecutor Parkinson first and then saw defendant in the hall later. He didn't know whose pictures he was looking at and the pictures were given to him without any verbal interchange (such as "here are the guys"). Gilliland stated at the time he was shown the pictures that one picture was of a guy who robbed him.

At the suppression hearing, defense counsel argued that the pretrial photo procedures of the prosecution were unfair and that it was impossible to proceed on the theory of defense earlier chosen (*i.e.*, total circumstantial evidence) now that an eyewitness had popped up. The State responded that the hallway incident was inadvertent and the court stated that if the whole fact pattern was merely the witness noticing the defendant in the hallway that there would be no problem. The court found, however, the suggestiveness of the photos in the total context of the facts to be troublesome and determined the question to be whether or not the circumstances were so suggestive as to override the evidence presented of independent origin. After argument by counsel and reviewing pertinent cases, the judge determined that within the perimeters of the facts and circumstances before him and the witness' testimony that the identification was independent of any of the procedures was believable. He denied the motion to suppress and for mistrial. Thereafter, Gilliland returned to the trial stand where defense counsel subjected him to a grueling cross-examination on this issue and whether Gilliland would not have been able to identify the defendant till the night before the trial.

As to the suggestiveness of the photo procedures, it seems well settled that the burden is on defendant to establish that the identification was the result of a procedure so suggestive as to give rise to a substantial likelihood of irreparable misidentification. (*People v. Green* (1976), 42 Ill. App. 3d 978, 356 N.E.2d 947.) Here, the prosecution's procedure of showing photos the day before trial to a witness who had never made an identification of the defendants is glaringly suggestive. Only two photos were shown, one of each defendant. This case is similar to *People v. Martin* (1970), 47 Ill. 2d 331, 338, 265 N.E.2d 685, 689, *cert. denied* (1971), 403 U.S. 921, 29 L. Ed. 2d 700, 91 S. Ct. 2240 where the court found reason to state its strong disapproval of the methods and procedure followed. And with such condemnation, we are in total accord and append our censure.

But—the question really boils down to this: was the trial court wrong in determining (on the basis of all the facts and circumstances) that there was no substantial likelihood of irreparable misidentification? Or—as our supreme court put it in *Martin*—"Nonetheless, in justice to society as well as to defendant, the question remains whether this questionable procedure unduly influenced the in-court identification or whether their origins were independently based."

■■■ And like the holding in *Martin,* and considering the totality of the evidence in the case at bar, we cannot hold that the trial court has erred. Yet, even if error did occur, the impact of the error was virtually buried because of defendant's confession and the corroboration of other witnesses (besides Gilliland) as to defendant's movements on that night. On balance, due to the weight of the evidence against defendant, any error in admitting the identification was harmless.

■■ Turning to the question of whether the State has violated duties of discovery, we note that the State not only answered discovery pursuant to court order, but that it voluntarily filed two separate supplementary discovery motions. Why the prosecutor did not follow through and give defense counsel warning of the fact that there would be an identification is inexplicable. Defense counsel is correct in arguing that he was caught totally unaware on a matter that, under our supreme court rules, was discoverable. The fact that the evidence was not born until shortly before trial in no way derogates from the State's duty to disclose. We do not interpret this, however, as defendant urges, to be a *Brady* problem of constitutional dimensions. Most of the information which came available on the day before trial would have been discoverable evidence, but evidence which certainly would not tend to *negate* guilt. Although defense counsel argues that there is a statement made which shows the ambivalent nature of the identification, the same statement was brought out during trial and cannot be said to be of such magnitude as to cause

immediate reversal. We find more sympathy in the argument that defense counsel was forced to change trial tactics in the middle of the stream because of the sudden eyewitness testimony.

■■ Yet, the evidence against defendant—apart from the identification and the withholding of the evidence of that identification taking place—is heavy enough, and the trial court heard the witness' testimony regarding the independent origin of the identification. Despite some lucidly suggestive procedures by the State the day before trial, the trial court's determination that the identification did have an independent origin is not incorrect. And notwithstanding the fact that the State violated its duty under Supreme Court Rule 412 to tell defense counsel of the identification of his defendant by an eyewitness, on the facts of this case demonstrating massive and overwhelming evidence of guilt, the error pales and fades into harmlessness.

A *caveat.* We emphasize that we do not—in any way—endorse or condone the suggestive methods and suppressive course of inaction employed by the prosecution here in an attempt to add a few more straws upon an already substantial case. Such conduct will win no laurels in today's concept of an enlightened adversary system where openness, fair notice and lack of undue surprise have become a hallmark. We underscore, in our holding, that against the backdrop of such overpowering and solid evidence of the guilt of the defendant in this case, the strange failure of the prosecution to comply with dictated practice becomes harmless.

## IV

### DID SENTENCING ERROR OCCUR?

■■ It is urged that error occurred at the sentencing hearing when evidence of other crimes not resulting in conviction were admitted into evidence.

In *People v. Adkins* (1968), 41 Ill. 2d 297, 242 N.E.2d 258, the Illinois Supreme Court stated:

> " '* * * The rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry [at a sentencing hearing]. It may look to the facts of the [crime], and it may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. In doing so it may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and, as was said in *People v. Popescue,* [345 Ill. 142], the judge should know

something of the life, family, occupation and record of the person about to be sentenced.' " 41 Ill. 2d 297, 301, 242 N.E.2d 258, 260.

Under this rationale, any evidence concerning other acts which may be crimes would be admissible. Furthermore, defendant did not object to any of the testimony. He may not now complain.

The conviction and sentence are affirmed.

Affirmed.

REARDON, P. J., and TRAPP, J., concur.