THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TURNER LLOYD *et al.*, Defendants-Appellants.

First District (5th Division)    Nos. 79-1283, 79-1284 cons.

Opinion filed March 6, 1981.

James J. Doherty, Public Defender, of Chicago (Timothy P. O'Neill, Assistant Public Defender, of counsel), for appellant Turner Lloyd.

Elliott Samuels, of Chicago, for appellant Maurice Barr.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Edwin Bishop, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendants Turner Lloyd and Maurice Barr were convicted of armed robbery. (Ill. Rev. Stat. 1977, ch. 38, par. 18—2.) Lloyd was sentenced to a prison term of eight years and Barr was sentenced to 12 years. On appeal, defendants contend that (1) the evidence failed to prove their guilt beyond a reasonable doubt; (2) the trial court erred in refusing to strike the identification testimony of one of the complaining witnesses; (3) the prosecutor's question relating to defendant Barr's drug use was improper and prejudicial; (4) the prosecutor's closing argument contained inflammatory remarks; (5) the verdict forms submitted to the jury were improper and prejudicial; (6) defendant Barr's sentence is excessive and should be reduced. We affirm.

On September 29, 1978, at approximately 12:30 or 1 a.m., John Behling, Steve Krol, Brian Thoma, and Marty Mora were sitting in Behling's parked car at 47th Street and Aberdeen in Chicago. There were three street lights in the area. As they sat talking and drinking beer, two men approached the car. One man, later identified as defendant Barr, asked for a cigarette. The other man, identified as defendant Lloyd, pulled a gun from under his jacket and ordered everyone out of the car. While Lloyd trained the gun on the victims, Barr unsuccessfully attempted to start Behling's car. Then Lloyd tried and failed to start the car. He told Behling to start the car, who also failed to do so. Next, Lloyd ordered Behling to join the other three men in the middle of the street. One defendant told the victims to empty their pockets and to put their wallets on the ground. Lloyd also took $140 from Behling's pocket. The four victims were then told to lie face down on the ground. Only Krol complied, but he stood up again after he noticed that the others had not done so. Defendants ran off after hearing a voice say "Come on," or "Hurry up." The robbery had lasted about 10-15 minutes.

On October 1, 1978, Behling and Krol identified both defendants from books of photographs. Although they were in the same room when they looked through the four books of approximately 50-75 photographs each, Krol and Behling identified defendants' photographs separately.

On October 4, 1978, Behling, Krol, and Thoma individually viewed a

six-man lineup. Behling identified both defendants, Krol identified Barr only, and Thoma identified Lloyd only.

At the trial, the complaining witnesses identified defendants as the men who had robbed them. On cross-examination, Behling testified that the prosecutor had discussed his testimony with him and had shown him defendants' photographs prior to trial. Behling further testified that he had been drinking his second beer when defendants approached the car. He had never seen Barr before the robbery and did not recall what he was wearing at the time. Behling stated that the taller assailant wore an Afro hairstyle; that one offender had a maroon jacket; and that the shorter assailant wore a grey cap. He recognized Barr and Lloyd in the lineup from their photographs and from the time of the robbery.

Following Behling's testimony, the defense moved to strike his identification evidence because the prosecutors had shown him defendants' photographs before the trial. The motion was taken under advisement, and, after further argument of counsel, denied.

The next witness, Krol, testified to the September 29, 1978, occurrences. His version was essentially the same as Behling's. On cross-examination, he stated that he had drunk about 1½ beers. He described Barr as having worn a dark jacket and dark pants and having a medium complexion and a natural hairstyle. He testified that his attention was fixed primarily on Barr during the robbery, but he saw Lloyd long enough to describe him to the police.

The third complaining witness, Thoma, testified that one of the offenders was tall and had an Afro, that one wore a dark blue coat, and that one wore a hat. He stated that he looked at Lloyd's face for approximately six minutes, during the time Lloyd pointed the gun at him.

On cross-examination, Thoma testified that he did not view police photographs on October 1, 1978, nor was he shown any photographs before the trial.

Police investigator Drew Englert testified that he conducted the defendants' lineup. Following their arrest, Englert told defendants that they were to be charged with armed robbery. He told them to stand anywhere in the lineup. They stood next to each other, in positions four and five. Behling identified both men, Krol identified Barr, and Thoma identified Lloyd.

On cross-examination, Englert testified that when defendants were arrested they had no weapons, nor did they have any of the property of complainants.

After the State rested, and defense motions for directed verdicts were denied, defendant Barr took the stand. He stated that he lived at home with his parents; he had never seen Lloyd before the October 4, 1978, arrest; he was not in the vicinity of 47th and Aberdeen on September

29, 1978, between the hours of 12:30 and 1 a.m.; he was not with Lloyd at any time during that evening, and he did not rob the victims.

According to Barr, he was in front of his brother's house at midnight on September 28, talking to a friend, George Palmer. Fifteen minutes later he walked to 50th Street and Prairie with his girlfriend Joyce Spivey and Palmer. The walk took approximately 15 minutes and they stayed at that location for 40 to 45 minutes. Then Barr and Palmer went to a nearby YMCA to telephone Palmer's girlfriend, while Spivey waited. Defendant and Palmer rejoined Spivey, and the three of them walked to a store to buy some wine. By this time it was 12:50 a.m. or 1 a.m. Spivey got into a car and left. Barr and Palmer waited, drinking the wine. Palmer then left. Shortly thereafter, Barr was told that Palmer and Spivey had been arrested, but he did not know why.

On cross-examination, Barr said that he lived with his girlfriend. When the prosecutor noted that he had earlier claimed a different address, that of his parents, he replied that he "stayed with" his parents because he was "still a teenager."

Barr recalled that he had been with about eight other people at his brother's house at midnight on September 28, 1978, but only remembered the name of his friend, Palmer. Earlier that evening he had been watching a program and drinking wine with his friends inside his brother's apartment. The prosecutor then asked:

"Q. Did you take any drugs?

A. No.

Mr. Samuels [defense counsel]: Objection, Your Honor.

The Court: He has already answered."

The defense counsel moved for a mistrial, which was denied. The court told the jury to disregard the question and answer.

Defendant testified that he had worn a maroon suit and a red flowered shirt on the night of the incident. He further testified that at the October 4 lineup he coincidentally stood next to defendant Lloyd. He stated that the police had not told him that he could choose where to stand in the lineup. He also denied having a conversation with Lloyd while they stood facing the wall immediately before the lineup.

After Barr rested, Lloyd's witnesses testified. His mother stated that she was familiar with many of her son's friends but did not know Barr. She recalled that she had seen her son at home on September 28, 1978, at about 6 p.m. She left the house thereafter and did not return until the next day.

Kerry Lloyd, defendant's brother, stated that he knew most of his brother's friends but did not know Barr. At approximately 6:30 p.m. on September 28, 1978, Kerry was sitting with two friends outside his house. Defendant spoke to them briefly and went inside. Kerry next saw his

brother at 8:30 or 9 p.m., sleeping in an upstairs bedroom with a quart of beer in his hands. Kerry went back downstairs and rejoined his two friends. The three of them remained outside until about 12:30-1 a.m. Kerry again went upstairs and saw his brother, still asleep. He took the beer bottle from his brother's hands. Kerry further testified that he did not see defendant leave the house that evening. When Kerry went to bed at 3 a.m., defendant was still asleep.

Betty Jean McMillan testified that she was sitting outside the Lloyd house on the night in question. She recalled speaking to defendant between 7 and 8:30 p.m. She also saw him between 12 and 12:30 a.m. when she went upstairs to use the washroom. He was sleeping in a bedroom with a quart beer bottle on his chest. On cross-examination, when she was asked whether it was a bottle or can of beer, she replied that "It was a quart. You know, the quart comes in 16 ounce cans." McMillan also testified that the people sitting around at the Lloyd house from 7 p.m. to midnight drank beer and smoked "reefers."

Investigator Englert, recalled as the State's rebuttal witness, stated that at the lineup he had seen Barr and Lloyd talking while they stood next to each other. He could not understand their actual words.

The State rested in rebuttal. The court informed the jury that the closing arguments were not to be considered as evidence, and the parties presented their arguments. Over defense objections the jury was given two verdict forms for each defendant, naming all three alleged victims in the same "guilty" and "not guilty" verdict forms.

The jury found both defendants guilty of armed robbery. Following a hearing in aggravation and mitigation, defendants were sentenced to serve prison terms in the State penitentiary.

OPINION

Defendants first contend that the State failed to prove their guilt beyond a reasonable doubt because of weaknesses in the identification evidence. We disagree.

The law that applies to this issue is clear. The State must prove that the accused committed the crime, and if the identification of defendant is "vague, doubtful, and uncertain," the conviction will be reversed. (*People v. Kelley* (1971), 133 Ill. App. 2d 151, 155, 272 N.E.2d 825, 828.) The testimony of one credible witness is sufficient to support the conviction, however, if "he viewed the accused under such circumstances as would permit a positive identification to be made." *People v. Yarbrough* (1977), 67 Ill. 2d 222, 226, 367 N.E.2d 666, 668.

■■ In the pending case, two of the eyewitnesses positively identified Barr on three separate occasions. All three complaining witnesses identified Lloyd. Behling, Krol, and Thoma had ample time to observe defendants

during the robbery, which lasted approximately 10-15 minutes. There were street lights in the area and both defendants were only a few feet away from the victims for at least part of the duration. As the facts reflect, both defendants were subsequently identified by at least two of the complaining witnesses from police photographs, from the lineup, and in court. We believe that the identification evidence amply supports the convictions. All the purported weaknesses in the State's evidence—the witnesses' "scanty" recollection of defendants' features and clothing, the fact that the witnesses had been drinking beer before the robbery, defendants' contention that they did not know each other—raise matters of credibility. It was for the jury to judge the identification evidence, along with defendants' alibi evidence, and to choose whom they believed. (*People v. Yarbrough; People v. Holmes* (1972), 6 Ill. App. 3d 254, 285 N.E.2d 561.) We cannot upset the jury's verdict unless the evidence is so improbable as to raise a reasonable doubt of defendants' guilt. On the record before us, we do not draw that conclusion.

Defendants' second contention is that the trial court erred in denying the defense motion to strike John Behling's in-court identification of defendants because the prosecutors showed him defendants' photographs just prior to trial. The prosecutor's conduct may have altered Behling's recollection, defendants charge, and thus violated their right to a fair trial.

We reject defendants' theory. While showing a witness a defendant's photograph prior to trial in some circumstances may be considered "highly suggestive" (see *People v. Martin* (1970), 47 Ill. 2d 331, 265 N.E.2d 685; *People v. Freeman* (1978), 60 Ill. App. 3d 794, 377 N.E.2d 107), the issue is whether the in-court identification is independently based and not unduly influenced by the photographs or other extraneous sources. (*Martin.*) In the instant case, Behling had previously identified defendants from a large group of photographs and had also selected defendants from the lineup. Therefore, we do not believe that his viewing of the photographs before trial unduly influenced him. Although the cases defendants rely upon contain language which disapproves of showing photographs to witnesses before a trial, the witnesses in those cases had not independently identified defendants. In *Freeman*, for example, the court found the prosecutor's procedure of showing a witness the defendant's photograph before trial to be "glaringly suggestive," especially since the witness had not previously identified the defendant. Despite this, the court affirmed defendant's conviction, based on the sufficiency of the other evidence.

■■ We believe that even if Behling's in-court identification had been stricken, the remaining identification evidence is sufficient to sustain defendants' conviction. Therefore, we conclude that the prosecutor's use of the photographs in this case did not prejudice defendants.

Defendant Barr next contends that he was deprived of a fair trial

because he was asked, on cross-examination, whether he had taken any drugs on the night of the robbery. He argues that the purpose and effect of the question was to create bias against him and put him in an unsavory light, thereby enhancing the likelihood of his conviction.

■■ We find defendant's argument to be meritless. The trial court sustained the objection to the question and told the jury to disregard it. We have often held that such action by the court cures the potential harm of improper remarks or questions. (*People v. Burnett* (1979), 74 Ill. App. 3d 990, 394 N.E.2d 456; *People v. Price* (1979), 76 Ill. App. 3d 613, 394 N.E.2d 1256.) We conclude that this single drug reference, which was answered in the negative, did not result in substantial prejudice to defendant or deprive him of a fair trial.

Defendants next challenge the prosecutor's closing argument, which they believe deprived them of a fair trial. In particular, they object to two comments, a remark that purportedly accused defense lawyers of "fraud" and a statement concerning the reasonable doubt standard. After reading the transcript and reviewing the pertinent law, we find defendants' argument unpersuasive.

Substantial latitude is accorded attorneys in their closing arguments at trial. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.) They may comment on the evidence and draw reasonable inferences from it. Even improper remarks may be considered harmless error if there is "overwhelming evidence" of defendant's guilt (*People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 390 N.E.2d 1339; *cf. People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880), and a new trial will not be granted because of improper remarks unless they are so prejudicial as to materially contribute to a defendant's conviction (see *Weathers*; *People v. Galloway* (1979), 74 Ill. App. 3d 624, 393 N.E.2d 608). Moreover, if the trial court sustains the objection and instructs the jury to disregard the challenged comment, the potentially prejudicial effect of the comment is generally deemed to be cured. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Olejniczak*.

The first challenged remark is: "What you heard here in these arguments of counsel is a culmination, a kind of fraud." The court sustained defendants' objection as to the use of the word "fraud." This remark was part of the prosecutor's attempt to refute defendants' claim that they did not know each other. The prosecutor's reference was to the defense tactic of having defendants sit apart from each other in the courtroom. While we do not condone the prosecutor's choice of words, we believe that the phrase "kind of a fraud" falls short of the type of verbal conduct that would warrant a reversal. Defendants' cited cases involve prosecutors' comments that far exceeded the bounds of fair comment on the evidence. For example, in *People v. Weathers*, the prosecutor accused defendant and his attorneys of having lied; labelled

defendant a "sharp cookie" whose lack of previous arrests merely indicated his skill in eluding police; stated that there was no reasonable doubt in the case but that the defense tried to create it by "confusion, indecision, and misrepresentation"; and declared that the court *knew* that defendant had committed the armed robbery. In remanding the case for a new trial the court noted that although there was "considerable evidence" against defendant, the State's arguments were not "inadvertent errors" but were, instead, "severely prejudicial," which might have contributed to defendant's conviction. (*People v. Weathers* (1975), 62 Ill. 2d 114, 120-21, 338 N.E.2d 880, 884.) Similarly, in *People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295, the court held that the prosecutor's remarks had exceeded the bounds of "proper courtroom decorum." The improper remarks included an accusation that the defense lawyers had committed character assassination of the State's witnesses and the characterization of defendant's position as a "preposterous defense" that the prosecutor could not believe because defense counsel did not believe it himself.

■■ We believe that the reference to "a kind of fraud" in the instant case is not so prejudicial as to require reversal. We also believe that the trial court cured any prejudicial effect by sustaining the objection and instructing the jury to disregard the remark.

Defendants also object to the prosecutor's remarks as to the reasonable doubt standard. He said:

"Ladies and gentlemen, I would like to mention something, I'm almost done, about reasonable doubt. You heard reasonable doubt over and over again. Well, reasonable doubt isn't some mythical standard, it doesn't put these two defendants on a pedestal. Every time—

Mr. Samuels: Objection to this argument, your honor.

The Court: No, the objection is overruled at this point. Go ahead, I am listening.

Mr. Erickson: Every defendant that has ever been convicted—

Mr. Samuels: I object to this argument.

The Court: The objection is overruled.

Mr. Erickson: (Continuing)—convicted of a crime in this country has been convicted beyond a reasonable doubt. It's not an impossible burden to meet, it is met in every criminal trial where there happens to be a conviction."

Defendants contend that these remarks imply that they were guilty because of their status as "criminal defendants." They rely on *Taylor v. Commonwealth of Kentucky* (1978), 436 U.S. 478, 486, 56 L. Ed. 2d 468, 476, 98 S. Ct. 1930, 1935, in which the United States Supreme Court disapproved of a prosecutor's statement that the accused, " *'like every other defendant* who's ever been tried who's in the penitentiary * * *

has this presumption of innocence until proved guilty beyond a reasonable doubt.' " The court noted that this statement could be viewed as an invitation to the jury to consider his status as a defendant as evidence tending to prove guilt. The court also questioned the propriety of the prosecutor's phrase, " '[o]ne of the first things *defendants do after they rip someone off* * * *.' " (Emphasis added.) (436 U.S. 478, 487, 56 L. Ed. 2d 468, 476, 98 S. Ct. 1930, 1935.) The court noted that these comments implied that all defendants are guilty. However, the main error in the case was the trial court's failure to instruct the jury of the defendant's presumption of innocence, and it was in this context that the Supreme Court found that the prosecutor's remarks as to the reasonable doubt standard were prejudicial. The court did not hold that the comments, standing alone, constituted reversible error; rather, the court emphasized the need for carefully framed instructions designed to ensure that a defendant be judged only on the evidence.

■■ In the pending case, the trial court properly instructed the jury as to the defendants' presumption of innocence and also stated that closing arguments were not to be viewed as evidence. We conclude, therefore, that in light of the strong evidence of defendants' guilt and the court's careful instruction to the jury, there is no prejudicial error regarding the prosecutor's closing arguments.

The fifth issue defendants raise is that the trial court, in submitting only two verdict forms for each defendant, erred because the armed robbery indictment consisted of three counts, each involving a separate complaining witness. Under section 115—4(j) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 115—4(j)), a jury must return a general verdict "as to each offense charged." Defendants argue that since each count is a separate offense, there should have been three separate sets of verdict forms. Instead, the "guilty" and "not guilty" verdict forms listed all three victims. Consequently, defendants argue, this may have precluded the jury from acquitting defendants on one or more of the three counts of armed robbery.

■■ We reject defendants' theory. Under our case law, when a general verdict of guilty is returned on an indictment which contains several counts arising out of the same transaction, the defendant is considered guilty on each count (*People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601; *People v. Mimms* (1976), 40 Ill. App. 3d 942, 353 N.E.2d 186), and "if the punishment imposed is one which is authorized to be inflicted for the offense charged in any one or more of the counts, the verdict must be sustained." *People v. Lymore* (1962), 25 Ill. 2d 305, 308, 185 N.E.2d 158, 159.

■■ We believe that these principles are dispositive of the pending case; the sentence imposed could have been given for any one of the three

armed robbery counts and the only difference among the offenses is that each involved a different victim. Under these circumstances, the trial court did not err in submitting only two verdict forms for each defendant.

Defendants' final contention is that Maurice Barr's 12-year prison term is excessive because Lloyd received only 8 years for the same conduct. Barr concedes that the trial court was entitled to hear the evidence in aggravation before sentencing the men. However, Barr argues that the court abused its discretion because he had no previous felony convictions, while Lloyd had previously served a one-year sentence for robbery. Defendants cite authorities for the principle that similarly situated co-defendants should receive substantially similar sentences.

■■ We do not agree that the trial court's sentences were excessive or that the imposition of four extra years on defendant Barr was an abuse of discretion. At Barr's sentencing, the evidence in aggravation included the testimony of three witnesses which indicated that Barr had been involved in a burglary and a rape. We note that the trial court is vested with broad discretion in determining criminal punishment and, in so doing, may consider such factors as defendant's demeanor, moral character, habits, age, and social environment. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) We conclude that the trial court did not abuse its discretion in imposing defendant Barr's sentence; therefore, we will not alter it.

For the foregoing reasons, we affirm the trial court's judgment.


Affirmed.


MEJDA and LORENZ, JJ., concur.